JONES Chief Judge, and HOWELL, MADDEN and WHITAKER, Judges, concur.

**ORO FINA CONSOLIDATED MINES, Inc. v. UNITED STATES.**

No. 49486.

United States Court of Claims.

Oct. 2, 1950.

H. H. Martin, Washington, D. C., George A. Nugent, Washington, D. C., on the brief, for plaintiff.

Melvin Richter, Washington, D. C., Newell A. Clapp, Acting Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

LITTLETON, Judge.

Plaintiff's petition alleges that it has succeeded to the mining rights in a gold mining property known as the Oro Fina Mine in Placer County, California. It is alleged that on October 8, 1942, the Director General for Operations of the War Production Board "arbitrarily and without authority of law" issued a Gold Mining Order, known as Limitation Order L–208, classifying plaintiff's gold mining property as a "nonessential mine" and requiring the operator to close down the mine. On January 18, 1943, the mine was closed in compliance with the order. As a result of the closing of the mine plaintiff has had to spend $72,584.38, so it alleges, in protecting its property. Plaintiff has received no compensation from the defendant on account of having to discontinue its mining operations and claims that it is entitled to receive $72,584.38 as an element of just compensation for the damages sustained as a result of compliance, under threat of punishment, with Order L–208. The order was revoked on June 30, 1945.

Defendant has demurred on three grounds (1) that plaintiff has alleged that the order was issued "arbitrarily and without authority of law" and this court lacks jurisdiction over claims for compensation for unauthorized takings by agents of the Government, (2) that the Director General's actions did not constitute a taking under the Fifth Amendment but rather were those of the Government in the proper exercise of its war powers from which can arise no cause of action against the Government, and (3) that the alleged taking occurred not later than January 1943, and that this suit, which was filed on February 8, 1950, is therefore barred by the six-year statute of limitations.

Any one of these grounds, if established, would be enough to sustain the demurrer. We will first consider the third ground. If plaintiff's suit is barred by its failure to comply with the procedural requirement of the statute, it will not be necessary for us to consider the substantive questions presented by defendant's first two objections. The statutory period is six years, 28 U.S.C.A. § 2501. Order L–208 was issued October 8, 1942. The Oro Fina mine was closed January 18, 1943. The order was revoked on June 30, 1945.

Defendant argues that according to the petition the alleged taking occurred not later than January 18, 1943, and that plaintiff's claim first accrued on that date, which was more than six years before this petition was filed. Defendant further contends that even if the taking be regarded as a series of successive takings ending with the revocation of Order L–208 on June 30, 1945, rather than as a single act, the statute would still bar recovery of any damages accruing before February 8, 1944.

Plaintiff argues that since there was no way of ascertaining the damages or amount of compensation due while Order L–208 remained in effect, the statute did not commence running until the order was revoked, on June 30, 1945. Plaintiff relies on United States v. Dickinson, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789. In that case, part of Dickinson's land, which had not been previously condemned, was flooded by the waters of Winfield Dam. The complaint was filed on April 1, 1943. The Government argued that the statute began to run either on October 21, 1936, when the dam began to impound water, or on May 30, 1937, when the dam was fully capable of operation, the water was raised above its former level, and plaintiff's property was partially submerged

for the first time. Although the latter date was within the statutory period, it would still bar Dickinson's claim because he acquired the land after that time.

■ The Court held that the claim was not barred. The Court said, 331 U.S. at page 748, 67 S.Ct. at page 1384, that in flooding the land without first condemning it, the Government left to the owner "the onus of determining the decisive moment in the process of acquisition by the United States when the fact of taking could no longer be in controversy." The Court further said, 331 U.S. at page 749, 67 S.Ct. at page 1385:

"We are not now called upon to decide whether in a situation like this a landowner might be allowed to bring suit as soon as inundation threatens. Assuming that such an action would be sustained, it is not a good enough reason why he must sue then or have, from that moment, the statute of limitations run against him. If suit must be brought, lest he jeopardize his rights, as soon as his land is invaded, other contingencies would be running against him—for instance, the uncertainty of the damage and the risk of *res judicata* against recovering later for damage as yet uncertain. The source of the entire claim—the overflow due to rises in the level of the river—is not a single event; it is continuous. And as there is nothing in reason, so there is nothing in legal doctrine, to preclude the law from meeting such a process by postponing suit until the situation becomes stabilized. An owner of land flooded by the Government would not unnaturally postpone bringing a suit against the Government for the flooding until the consequences of inundation have so manifested themselves that a final account may be struck."

Unlike the Dickinson case, the source of the claim here *was* a single event—the closing of the Oro Fina Mine in compliance with Order L–208. The cases are distinguishable, perhaps to plaintiff's disadvantage, on that ground. But in one respect, there is more reason in the present case than there was in the Dickinson case for not commencing the statutory period with the Government's first act. From the time the plans for the Winfield Dam were completed, there was no doubt what would be taken; what lands would be inundated was a matter of engineering calculation. The problem there was when. The problem here is not so much when the taking, if it was a taking, occurred, as what it was, precisely, that was taken. Until Order L–208 was revoked, no one could know exactly what had been taken from the standpoint of compensation. The United States never had any intention of keeping plaintiff's mine closed permanently. The order was a wartime measure, designed and intended to divert gold miners into the more essential field of copper mining. There was never any doubt that the ban would be lifted after the war or as soon as the situation permitted. If defendant took anything, it took a temporal interest, perhaps for one year, perhaps for five, perhaps for more. Under the circumstances, it would be unfair if the statute had started running against plaintiff at a time when there was no way of knowing the duration of the interest taken. While not exactly like the case at bar, the Dickinson case is pertinent because it recognized that the statute of limitations in taking cases does not necessarily begin to run at the first moment that the plaintiff could have brought suit. It was held in the Dickinson case that an aggrieved owner need not bring suit until the consequences of the taking "have so manifested themselves that a final account may be struck." Cf. Baker v. City of Fort Worth, 146 Tex. 600, 210 S.W.2d 564, 5 A.L.R.2d 302 and Developments in the Law—Statutes of Limitations, 63 Harv.L.Rev. 1177, 1200 et seq. It was not finally clear until June 30, 1945, what had been "taken" from plaintiff. We cannot hold that the consequences of the alleged taking had so manifested themselves by February 8, 1944—the day six years prior to the filing of the petition—that, in the language of the Dickinson case, a final account could have been struck at that time or that the situation had by that time become stabilized. Nor would it accord with the spirit of that decision to limit plaintiff's recovery to damages occurring after February 8, 1944.

We must, therefore, consider the question of whether by ordering a closing down of the nation's gold mines the United States took private property and thus became bound either by the Fifth Amendment or by implied contract to make compensation. At the threshold of this inquiry we are met with defendant's first ground of demurrer.

Plaintiff has alleged that the order was issued "arbitrarily and without authority of law." In opposition to the Government's demurrer plaintiff argues that the taking was, nevertheless, tantamount to a taking with full statutory authority since it was under the authority of the War Production Board. Plaintiff relies on International Paper Co. v. United States, 282 U.S. 399, 51 S.Ct. 176, 75 L.Ed. 410. In that case the United States requisitioned a utility company's power output, and the Court held that this constituted a taking of plaintiff's right, under a lease, to some of that power. The Court said, 282 U.S. at page 406, 51 S.Ct. at page 177:

"The Government has urged different defenses with varying energy at different stages of the case. The latest to be pressed is that it does not appear that the action of the Secretary [of War] was authorized by Congress. We shall give scant consideration to such a repudiation of responsibility. The Secretary of War in the name of the President, with the power of the country behind him, in critical time of war, requisitioned what was needed and got it. Nobody doubts, we presume, that if any technical defect of authority had been pointed out it would have been remedied at once. The Government exercised its power in the interest of the country in an important matter, without difficulty, so far as appears, until the time comes to pay for what it has had. The doubt is rather late. We shall accept as sufficient answer the reference of the petitioner to the National Defense Act * * * [39 Stat. 166, 213], giving the President in time of war power to place an obligatory order with any corporation for such product as may be required, which is of the kind usually produced by such corporation." ·

This case can hardly be interpreted as overturning the familiar rule that an un-authorized act of taking by a Government agent is not an act which will make the Government liable. See United States v. Goltra, 312 U.S. 203, 208, 61 S.Ct. 487, 85 L.Ed. 776, and United States v. North American Transp. & Trading Co., 253 U.S. 330, 40 S.Ct. 518, 64 L.Ed. 935. But it does establish that the Government cannot escape liability by pleading that it lacked authority to take what it did in fact take and retain. Cf. United States v. Buffalo Pitts Co., 234 U.S. 228, 34 S.Ct. 840, 58 L.Ed. 1290, and Hooe v. United States, 218 U.S. 322, 31 S.Ct. 85, 54 L.Ed. 1055. If Order L–208 resulted in an unauthorized taking, it was a taking of which the Government retained the benefit and for which it would therefore be obligated to pay.

However, we do not feel obliged by the demurrer to accept as a fact plaintiff's contention that Order L–208 was issued illegally. The petition recites the laws, regulations, and executive orders under which the Director General of the War Production Board purported to act in issuing the order. The question whether his action was legal and authorized is a judicial function, and in the exercise of that function we are not bound by the fact that illegality is alleged in the petition.

We do not doubt the Board's competence to issue the order. Neither, of course, does the defendant; it merely argues that the plaintiff, by alleging illegality, has pleaded itself out of court. A demurrer, however, admits only such facts as are well pleaded. The allegation as to the illegality of Order L–208 is a conclusion of law and was not admitted by the demurrer. Nortz v. United States, 294 U.S. 317, 55 S.Ct. 428, 79 L.Ed. 907, 95 A.L.R. 1346; James A. Hearn & Son, Inc., v. United States, 8 F.Supp. 698, 80 Ct.Cl. 260. There would, in any event, be little point in sustaining the demurrer on this ground; for, if we did so, we should be disposed to allow plaintiff to amend its petition by deleting the offending allegation under Rule 24 of the Court, 28 U.S.C.A.

The question raised by defendant's second ground of demurrer is whether the Government through Order L–208 took plaintiff's property. The Government contends that

it did not, that the issuance of the order was an exercise of the war power for the effects of which it is not liable. In St. Regis Paper Co. v. United States, 76 F.Supp. 831, 110 Ct.Cl. 271, certiorari denied 335 U.S. 815, 69 S.Ct. 32, 93 L.Ed. 370, we had a similar case. Plaintiff there was engaged in manufacturing and selling bleached and unbleached kraft pulp. Raw material in the form of pulpwood logs was essential to its operations. The War Production Board issued an order that no plant in plaintiff's area should consume, process, or deliver any pulpwood except upon a specific authorization of the Board. As a result of compliance with this order plaintiff's plant was closed down for a year and a half. Plaintiff sought to recover on the theory that the orders of the Board constituted a taking of its property. We sustained the defendant's demurrer, holding that the exercise of the war power in that instance did not result in a taking.

The issue is whether Order L-208 was a regulation or a requisition. See Abels, Price Control in War and Emergency, 90 U. of Pa.L.Rev. 675, and Marcus, The taking and Destruction of Property Under a Defense and War Program, 27 Corn.L.Q. 317, 515. The war power "is a power to wage war successfully, and thus it permits the harnessing of the entire energies of the people in a supreme co-operative effort to preserve the nation." Home Building & Loan Association v. Blaisdell, 290 U.S. 398, 426, 54 S.Ct. 231, 235, 78 L.Ed. 413, 88 A.L.R. 1481. See also United States v. Macintosh, 283 U.S. 605, 622, 51 S.Ct. 570, 75 L.Ed. 1302. In a time when even one's freedom of person may be greatly restricted, Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774, there can be little doubt of the Government's power to restrict one's freedom to mine gold. In time of war or national emergency rent control can be imposed. Woods v. Cloyd W. Miller Co., 333 U.S. 138, 68 S.Ct. 421, 92 L.Ed. 596; Bowles v. Willingham, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892. Commodity prices can be controlled. Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834. Materials may be allocated among producers and dis-

tributors; they may be taken away from a wasteful factory and routed to an efficient one; they may be withheld from retailers violating the rationing regulations. L. P. Steuart & Bro., Inc., v. Bowles, 322 U.S. 398, 64 S.Ct. 1097; 88 L.Ed. 1350. Prohibition may be ordered. Ruppert, Inc., v. Caffey, 251 U.S. 264, 40 S.Ct. 141, 64 L. Ed. 260; Hamilton v. Kentucky Distilleries & Warehouse Co., 251 U.S. 146, 40 S.Ct. 106, 64 L.Ed. 194. A purchaser's rights under a contract may be frustrated by a taking from his contractor. Omnia Commercial Co. v. United States, 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773. All these things the Government may do without making compensation. And yet the Constitution is not suspended in time of war; where there is a taking, there must still be compensation. Hamilton v. Kentucky Distilleries & Warehouse Co., supra; United States v. L. Cohen Grocery Co., 255 U.S. 81, 88, 41 S.Ct. 298, 65 L.Ed. 516, 14 A.L.R. 1045. Where compensation was not required, it was because it was held that there had been no taking; the damage done to property was done incidentally in the proper exercise of a legitimate governmental or sovereign power. The point was clearly made in the Legal Tender Cases, 12 Wall. 457, 551, 20 L.Ed. 287:

"That provision [Fifth Amendment] has always been understood as referring only to a direct appropriation, and not to consequential injuries resulting from the exercise of lawful power. It has never been supposed to have any bearing upon, or to inhibit laws that indirectly work harm and loss to individuals. A new tariff, an embargo, a draft, or a war may inevitably bring upon individuals great losses; may, indeed, render valuable property almost valueless. They may destroy the worth of contracts. But whoever supposed that, because of this, a tariff could not be changed, or a non-intercourse act, or an embargo be enacted, or a war be declared?"

Without becoming liable to make compensation, the Government may adversely affect property values in the exercise of other powers than the war power, for example, the power to regulate the currency, Norman v. Baltimore & Ohio Railroad Co., 294

U.S. 240, 55 S.Ct. 407, 79 L.Ed. 885, 95 A.L.R. 1352; Legal Tender Cases, supra; or the interstate commerce power, Louisville and Nashville Railroad Co. v. Mottley, 219 U.S. 467, 31 S.Ct. 265, 55 L.Ed. 297, 34 L.R.A., N.S., 671; Wallace v. Hudson-Duncan & Co., 9 Cir., 98 F.2d 985. Similarly, a State may in the exercise of its police power greatly restrict the use of property without becoming liable under the Fourteenth Amendment to make compensation. Hadacheck v. Sebastian, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348, Ann.Cas.1917B, 927; Mugler v. Kansas, 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205. And the national authority may do the same in the proper exercise of its powers. "If the nature and conditions of a restriction upon the use or disposition of property is such that a state could, under the police power, impose it consistently with the Fourteenth Amendment without making compensation, then the United States may for a permitted purpose impose a like restriction consistently with the Fifth Amendment without making compensation * * *." Hamilton v. Kentucky Distilleries & Warehouse Co., supra, 251 U.S. at page 156, 40 S.Ct. at page 108. But there are limitations. In Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322, 28 A.L.R. 1321, the court said: "The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." In that case plaintiff had reserved in a deed the right to mine under a certain house. A later State statute prohibited mining that would cause subsidence of a dwelling. The Court held the statute unconstitutional. Plaintiff's reserved right to mine under the house was property which the State could not deprive it of, through an exercise of the police power, without making compensation.

Mr. Justice Brandeis dissented, 260 U.S. at page 417, 43 S.Ct. at page 161:

"Every restriction upon the use of property imposed in the exercise of the police power deprives the owner of some right theretofore enjoyed, and is, in that sense, an abridgment by the state of rights in property without making compensation. But restriction imposed to protect the public health, safety or morals from dangers threatened is not a taking. The restriction here in question is merely the prohibition of a noxious use. The property so restricted remains in the possession of its owner. The state does not appropriate it or make any use of it. The state merely prevents the owner from making a use which interferes with paramount rights of the public. Whenever the use prohibited ceases to be noxious—as it may because of further change in local or social conditions—the restriction will have to be removed and the owner will again be free to enjoy his property as heretofore."

This reasoning, that all property is subject to regulation in the interests of the public safety, was not regarded by the majority in the Pennsylvania Coal case as appropriate to the facts there presented. It is, however, an approach which the Court, in cases it did consider appropriate, has adopted. These cases appear to us as more analogous to the case at bar than the Pennsylvania Coal case. In Mugler v. Kansas, supra, State prohibition was upheld against the objection of a brewer whose breweries, which were especially adapted to the manufacture of alcoholic beverages, had been greatly diminished in value by the imposition of prohibition. The Court said, 123 U.S. at page 665, 8 S.Ct. at page 299:

"The principal that no person shall be deprived of life, liberty, or property without due process of law * * * has never been regarded as incompatible with the principle, equally vital, because essential to the peace and safety of society, that all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community."

And, 123 U.S. at pages 668–669, 8 S.Ct. at page 301:

"As already stated, the present case must be governed by principles that do not involve the power of eminent domain, in the exercise of which property may not be taken for public use without compensation. A prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, can-

not, in any just sense, be deemed a taking or an appropriation of property for the public benefit. Such legislation does not disturb the owner in the control or use of his property for lawful purposes, nor restrict his right to dispose of it, but is only a declaration by the state that its use by any one, for certain forbidden purposes, is prejudicial to the public interests. * * The power which the states have of prohibiting such use by individuals of their property, as will be prejudicial to the health, the morals, or the safety of the public, is not, and, consistently with the existence and safety of organized society, cannot be, burdened with the condition that the state must compensate such individual owners for pecuniary losses they may sustain, by reason of their not being permitted, by a noxious use of their property, to inflict injury upon the community."

The Mugler case is clearly distinguishable from the Pennsylvania Coal case in that the prohibition there did not work to the particular advantage of any individual but was in all respects for the benefit of the whole community. Order L–208 did not confer any rights on any individual. The Mugler case is similar to the case at bar in another respect. In that case proper authority had decided that such prohibition on the use of property was necessary for the protection of the community. In this case the Government decided, and that decision is not for us to question, that continued mining of gold was injurious to the war effort; it decided, in effect, that the safety of the country demanded that gold mining cease. We cannot say that the Government must pay for the incidental effects of measures regulating the use of property adopted to protect the nation.

In Home Building & Loan Association v. Blaisdell, supra, a State statute enacted in time of economic depression extending the redemption period of mortgages, was held valid over the objection of a mortgagee-purchaser that it violated the contract clause of the Constitution. The Court held, 290 U.S. at page 444, 54 S.Ct. at page 242, that an emergency existed "which furnished a proper occasion for the exercise of the reserved power of the state to protect the vital interests of the community." The Court also noted that the integrity of the mortgage indebtedness was not impaired; it held that, because of the emergency, the State legislature could, in the vital interests of the community postpone the contract rights of mortgagees to foreclose on a certain date. The Court saw an analogy in an exercise of the war power by the Federal Government.

■ We think that the principle that the use and enjoyment of property may under proper circumstances be regulated or restricted or even temporarily suspended in order to protect the whole public is applicable to the case at bar. The war provided the proper circumstances. The United States did not take plaintiff's property or impose a servitude on it, as Pennsylvania was held to have done in the Pennsylvania Coal case. What the Government did here was to impose a permissible restriction upon the use by plaintiff of its property in the interests of the general safety. We held the order in the St. Regis case, supra, to be a regulation rather than a taking. We adhere to the principles announced in that opinion. The effect of the order in that case was exactly the same as the effect of Order L–208 in this case. In the St. Regis case we said, 76 F.Supp. at page 833, 110 Ct.Cl. at page 275:

"It is not sufficient that damages have resulted or that hardships have occurred. War inevitably produces hardships, suffering and losses, some of which cannot be measured in money. Legitimate war powers must be exercised, whatever the cost. Otherwise everything is lost."

We see no relevance in the distinction between the cases, urged by plaintiff, that Order L–208 was a direct order to plaintiff to close down while the order in the St. Regis case merely forbade the paper company to use the materials it needed to continue to operate. We decline to hold that the Government may not do directly what we have already held it may do indirectly.

Order L–208 had the tenor of a temporary restriction. It was a war measure, and was not intended to operate as a permanent restriction, as was the statute in the Penn-

sylvania Coal case, supra. As an emergency restriction it was similar to the restrictions imposed in the Blaisdell and St. Regis cases, supra. It is clear that a taking was not intended. The defendant did not deprive plaintiff of property by bestowing a right on another, as the statute in the Pennsylvania Coal case in effect did. The Government did not take over or use plaintiff's land; it did not take any gold; there was as much gold in the Oro Fina mine on June 30, 1945, when Order L–208 was revoked, as there was on January 18, 1943, when the mine was closed. Title and possession remained in plaintiff. The Government merely forbade, for the time being, the mining of gold on this land. If this had the effect of depriving plaintiff temporarily of the only interest it had in the land, and if, because plaintiff's interest was not in fee but was for a definite duration, it made that interest less valuable, these adverse effects were incidents, not so much of Order L–208, as of the kind of ownership that plaintiff had. The Government is not liable for such effects.

Plaintiff was put to expense in complying with an order of the sovereign. But since the order did not, in our opinion, result in a taking of private property for public use, we must hold that plaintiff has no cause of action against the United States. Although Order L–208 imposed a restriction upon the use of private property, we hold that it was a regulation rather than a taking, a regulation which was permissible because the national safety demanded it, and which was valid under the war power. The United States cannot, therefore, be held liable to make compensation to one who was put to expense in complying with it. The defendant's demurrer is sustained and the petition is dismissed. It is so ordered.

JONES, Chief Judge, and HOWELL, MADDEN, and WHITAKER, Judges, concur.