### IDAHO MARYLAND MINES CORP. v. UNITED STATES.

No. 50182.

United States Court of Claims.
May 6, 1952.

George Herrington, San Francisco, Herbert H. Salinger, Bacigalupi, Elkus & Salinger, and Orrick, Dahlquist, Neff & Herrington, all of San Francisco, Cal., for plaintiff.

Thomas L. McKevitt, Washington, D. C., Wm. Amory Underhill, Asst. Atty. Gen., and Holmes Baldridge, Asst. Atty. Gen., R. W. Koskinen, Washington, D. C., on the brief, for defendant.

LITTLETON, Judge.

This case arises out of an alleged taking, under and within the meaning of the Fifth Amendment to the Constitution, of plaintiff's gold mining properties in the County of Nevada, California, by virtue of the complete closing of plaintiff's mine by the War Production Board pursuant to Limitation Order L–208, issued by that Board, which order, plaintiff insists, upon the facts alleged, was arbitrary and violative of plaintiff's property rights with respect to the operation of its gold mining properties.

The original petition in this case was filed on June 4, 1951. Defendant's answer, filed August 3, 1951, contained special defenses challenging the sufficiency of the complaint and, upon defendant's motion, an order was entered directing that the case be calendared for hearing by the court on the special defenses. Arguments in this case and in two other cases [1] involving similar issues were heard on November 5, 1951. At the oral argument, counsel for this petitioner and counsel for Central Eureka Mining Company (case No. 49468) were granted permission to file amended

1. Central Eureka Mining Company v. United States, 121 Ct.Cl. ——, Homestake Mining Company v. United States, 121 Ct.Cl. ——.

2. 92 F.Supp. 1016, 118 C.Cls. 18, certiorari denied 341 U.S. 948, 71 S.Ct. 1015, 95 L.Ed. 1371, rehearing denied 342 U.S. 843, 72 S.Ct. 23.

3. Part 3093—Gold Mining (Limitation Order L–208), 7 F.R. 7992. "The fulfillment of requirements for the defense of the United States has created a shortage in the supply of critical materials for defense, for private account and for export which are used in the maintenance

petitions. Plaintiff herein filed its amended petition on November 19, 1951.

Defendant has moved to dismiss the amended petition on the grounds that it fails to state a claim upon which relief can be granted and also fails to state a claim within the jurisdiction of this court. It is defendant's position that the amended petition raises the identical issue decided adversely to similarly situated mine owners in the case of Oro Fino Consolidated Mines, Inc. v. United States,[2] where the Government's demurrer was sustained and the petition dismissed; that the amended petition in reality contains nothing new, but merely sets out in greater detail evidentiary material in support of this plaintiff's claim that Limitation Order L–208 "should not have been issued because it was unwise and not effective"; that within the meaning of our decision in the Oro Fino case nothing was taken from this plaintiff; that the United States need not pay compensation for losses or damage occasioned through the exercise of a regulatory power; that this court has no power to review the decisions of the War Production Board; that gold mining is well known to be a useless luxury in time of war and an injurious luxury to the extent that it kept material and workers out of mines producing critical materials, and that this court has already held in the Oro Fino case that it will not and cannot question the War Production Board's decision that continued mining of gold was injurious to the war effort.

Limitation Order L–208, set forth in full below,[3] and which is challenged in each

and operation of gold mines; and the following order is deemed necessary and appropriate in the public interest and to promote the national defense.

"§ 3093.1 *Limitation Order L–208*— (a) *Definitions*. For the purpose of this order, "nonessential mine" means any mining enterprise in which gold is produced, whether lode or placer, located in the United States, its territories or possessions, unless the operator of such mining enterprise is the holder of a serial number for such enterprise which has been issued under Preference Rating Order P–56.

of the gold mining cases now before the the case of Alaska-Pacific Consolidated court as well as in the Oro Fino case and Mining Co. v. United States, 120 Ct.Cl. 307,

"(b) *Restrictions upon production.* (1) On and after the issuance date of this order, each operator of a nonessential mine shall immediately take all such steps as may be necessary to close down, and shall close down, in the shortest possible time, the operations of such mine.

"(2) In no event on or after 7 days from the issuance date of this order shall any operator of a nonessential mine acquire, consume, or use any material, facility, or equipment to break any new ore or to proceed with any development work or any new operations in or about such mine.

"(3) In no event on or after 60 days from the issuance date of this order shall any operator of a nonessential mine acquire, consume, or use any material, facility, or equipment to remove any ore or waste from such mine, either above or below ground, or to conduct any other operations in or about such mine, except to the minimum amount necessary to maintain its buildings, machinery, and equipment in repair, and its access and development workings safe and accessible.

"(4) The provisions of this order shall not apply to any lode mine which produced 1,200 tons or less of commercial ore in the year 1941, provided the rate of production of such mine, after the issuance date of this order, shall not exceed 100 tons per month, nor to any placer mine which treated less than 1,000 cubic yards of material in the year 1941, provided that the rate of treatment of such placer mine, after the issuance date of this order, shall not exceed 100 cubic yards per month.

"(5) Nothing contained in this order shall limit or prohibit the use or operation of the mill, machine shop, or other facilities of a nonessential mine in the manufacture of articles to be delivered pursuant to orders bearing a preference rating of A–1–k or higher, or in milling ores for the holder of a serial number under Preference Rating Order P–56.

(c) *Restrictions on application of preference ratings.* No person shall apply any preference rating, whether heretofore or hereafter assigned, to acquire any material or equipment for consumption or use in the operation, maintenance, or repair of a nonessential mine, except with the express permission of the Director General for Operations issued after application made to the Mining Branch, War Production Board.

"(d) *Assignment of preference ratings.* The Director General for Operations, upon receiving an application in accordance with paragraph (c) above, may assign such preference ratings as may be required to obtain the minimum amount of material necessary to maintain such nonessential mine on the basis set forth in paragraph (b) (3) above.

"(e) *Records.* All persons affected by this order shall keep and preserve, for not less than two years, accurate and complete records concerning inventory, acquisition, consumption, and use of materials, and production of ore.

"(f) *Reports.* All persons affected by this order shall execute and file with the War Production Board such reports and questionnaires as said Board shall from time to time prescribe.

"(g) *Audit and inspection.* All records required to be kept by this order shall, upon request, be submitted to audit and inspection by duly authorized representatives of the War Production Board.

"(h) *Communications.* All reports to be filed, appeals, and other communications concerning this order should be addressed to: War Production Board, Mining Branch, Washington, D.C. Ref:L–208.

"(i) *Violations.* Any person who wilfully violates any provision of this order, or who, in connection with this order, wilfully conceals a material fact or furnishes false information to any department or agency of the United States, is guilty of a crime, and upon conviction may be punished by fine or imprisonment. In addition, any such person may be prohibited from making or obtaining further deliveries of, or from processing or using, material under priority control and may be deprived of priorities assistance.

"(j) *Appeal.* Any person affected by this order who considers that compliance therewith would work an exceptional and unreasonable hardship upon him may appeal to the War Production Board, by letter, in triplicate, setting forth the pertinent facts and the reason he considers he is entitled to relief. The Director General for Operations may thereupon take such action as he deems appropriate.

"(k) *Applicability of priorities regulations.* This order and all transactions affected thereby are subject to all applicable provisions of the priorities regulations of the War Production Board, as amended from time to time.

580

purported on its face to be necessary and appropriate in the public interest and to promote the national defense by the preservation of critical materials for defense, for private account and for export, which materials were used in the maintenance and operation of gold mines. It determined that gold mines, whether lode or placer, were nonessential mines. It provided that on and after the issuance of the order. (October 8, 1942), the operators of such declared nonessential gold mines should immediately close down the mines in the shortest possible time; that no new ore could be broken or any development or new operations proceeded with after 7 days from the issuance of the order; that after 60 days from the issuance of the order, operators of gold mines might not remove ore or waste from the mines, or conduct any other operations in or about the mines, except to the minimum amount necessary to maintain the buildings, machinery and equipment in repair, and the access and development workings safe and accessible. Certain small mining operations were excepted from the order, provided their rate of production did not thereafter exceed 100 tons per month (lode mines) or 100 cubic yards per month (placer mines); that the Director General for Operations might issue preference ratings to permit the obtaining of the minimum amount of material necessary to maintain the gold mine's buildings, machinery and equipment in repair, and its access and development workings safe and accessible, and for no other purpose. The order provided that any person violating any provision of the order would be deemed guilty of a crime, and upon conviction, might be punished by fine or imprisonment, and might be prohibited from making or obtaining further deliveries of, or from using, material under priority control, and might be deprived of priorities assistance; that anyone affected by the order might appeal to the War Production Board and that the Director General for Operations might take such action thereon as he deemed appropriate.

In support of its motion to dismiss, the Government relies chiefly on this court's decision in the Oro Fino case, supra, sustaining defendant's demurrer. In the Oro Fino case, the petition alleged, in substance, that plaintiff was the owner of the mining rights of a gold mining property; that pursuant to Limitation Order L–208, which classified plaintiff's gold mining property as a nonessential mine, the mine was closed; that plaintiff incurred certain expense in the protection of its closed facility; that the limitation order was arbitrary and that plaintiff was therefore entitled to just compensation for the damages sustained by it due to compliance with such arbitrary order. Defendant demurred to the petition for the reason, among others, that the action of the Director General in closing the mine did not constitute a taking under the Fifth Amendment to the Constitution, but was rather an act of the Government in the proper exercise of its war power from which can arise no cause of action against the Government.

The court sustained the Government's demurrer and held that the petition did not allege facts sufficient to establish a taking of plaintiff's property. We held that the petition in the Oro Fino case, when considered with Order L–208, revealed no more than a valid exercise by the Government of its constitutional war power in connection with the national safety.

The original petition in the instant case alleged substantially the same facts as were alleged in the Oro Fino case.

In sustaining the Government's demurrer to the petition in the Oro Fino case, we were mindful of two fundamental rules: (1) that a demurrer admits only well pleaded facts and does not admit allegations which are merely conclusions of law or general conclusions of fact; and (2) that a strong presumption exists in favor of the constitutionality of a regulation or a stat-

"(P.D.Reg.1, as amended, 6 F.R. 6680; W.P.B.Reg.1, 7 F.R. 561; E.O. 9024, 7 F.R. 329; E.O. 9040, 7 F.R. 527; E.O. 9125, 7 F.R. 2719; sec. 2(a), Pub.Law 671, 76th Cong., as amended by Pub. Laws 89 and 507, 77th. Cong.).

"Issued this 8th day of October 1942. "Ernest Kanzler, *Director General for Operations.*"

ute. In the case of Pacific States Box & Basket Co. v. White, 296 U.S. 176, 56 S.Ct. 159, 80 L.Ed. 138, the court had occasion to apply both rules in a matter somewhat similar to the one now before this court. Plaintiff therein, Pacific States Box & Basket Co., brought an action in the federal court in Oregon to enjoin enforcement of an order of the Oregon State Department of Agriculture on the ground that the order, and the statutes purporting to authorize it, violated rights of the plaintiff guaranteed by the Fourteenth Amendment to the Constitution. Defendant, Director of the State Department of Agriculture, moved to dismiss the petition on the ground that it did not state facts sufficient to entitle the plaintiff to relief. The statute there in question authorized the Chief of the Division of Plant Industry, after investigation and public hearing, and subject to the approval of the Director of Agriculture, to fix and promulgate official standards for containers of horticultural products in order to promote, protect, further and develop the horticultural interests of the State. After a public hearing held as prescribed in the act, an order was issued declaring containers of certain prescribed sizes should be standard for raspberries and strawberries. Plaintiff had been manufacturing and selling for many years a type of container used for raspberries and strawberries which did not conform to the newly prescribed standard. The petition alleged that the effect of the order was to prevent the sale by plaintiff of such nonconforming containers; that plaintiff had no facilities for manufacturing containers of the newly prescribed "standard" variety; that because of the expense of installing the requisite machinery and the cost of transporting the appropriate supplies to its plant, it was impractical for plaintiff to make the standard containers; and that the effect of the order was to exclude plaintiff's containers from use in Oregon. Plaintiff then alleged, among other things, that the order violated its rights under the due process clause of the Fourteenth Amendment because the order was arbitrary, capricious, and not reasonably necessary for the accomplishment of any

legitimate purpose of the police power. Plaintiff further contended that since the case was heard on a motion to dismiss, all allegations in the petition must be accepted as true, including the charge that there was no necessity for the particular orders relating to strawberries or raspberries based on considerations of public health, or to prevent fraud or deception, or any other legitimate use of the police power; that the particular container described did not of necessity promote, protect, further or develop the horticultural interests of the State; and that its necessary effect was to grant a monopoly to manufacturers of the so-called "hallocks." In affirming the lower court's dismissal of the petition, the United States Supreme Court, 296 U.S. at pages 185, 186, 56 S.Ct. at page 163, stated in part:

"*Fifth* * * * The order here in question deals with a subject clearly within the scope of the police power. See Turner v. Maryland, 107 U.S. 38, 2 S.Ct. 44, 27 L.Ed. 370. When such legislative action 'is called in question, if any state of facts reasonably can be conceived that would sustain it, there is a presumption of the existence of that state of facts, and one who assails the classification must carry the burden of showing by a resort to common knowledge, or other matters which may be judicially noticed, or to other legitimate proof, that the action is arbitrary.' Borden's Farm Products Co. v. Baldwin, 293 U.S. 194, 209, 55 S.Ct. 187, 192, 79 L.Ed. 281. The burden is not sustained by making allegations which are merely the general conclusions of law or fact. See Public Service Comm'n v. Great Northern Utilities Co., 289 U.S. 130, 136, 137, 53 S.Ct. 546, 77 L.Ed. 1080. *Facts relied upon to rebut the presumption of constitutionality must be specifically set forth* [italics supplied]. See Aetna Insurance Co. v. Hyde, 275 U.S. 440, 48 S.Ct. 174, 72 L.Ed. 357; O'Gorman & Young v. Hartford Fire Insurance Co., 282 U.S. 251, 51 S.Ct. 130, 75 L.Ed. 324; Hegeman Farms Corp. v. Baldwin, 293 U.S. 163, 55 S.Ct. 7,

79 L.Ed. 259. A motion to dismiss, like a demurrer, admits only facts well pleaded. Compare St. Louis, Kennett & Southeastern R. Co. v. United States, 267 U.S. 346, 349, 45 S.Ct. 245, 69 L.Ed. 649.

"*Sixth.* It is urged that this rebuttable presumption of the existence of a state of facts sufficient to justify the exertion of the police power attaches only to acts of Legislature; and that where the regulation is the act of an administrative body, no such presumption exists, so that the burden of proving the justifying facts is upon him who seeks to sustain the validity of the regulation. The contention is without support in authority or reason, and rests upon misconception. Every exertion of the police power, either by the Legislature or by an administrative body, is an exercise of delegated power. Where it is by a statute, the Legislature has acted under the power delegated to it through the Constitution. Where the regulation is by an order of an administrative body, that body acts under a delegation from the Legislature. * * * But where the regulation is within the scope of authority legally delegated, the presumption of the existence of facts justifying its specific exercise attaches alike to statutes, to municipal ordinances, and to orders of administrative bodies. Compare Aetna Insurance Co. v. Hyde, 275 U.S. 440, 447, 48 S.Ct. 174, 72 L.Ed. 357. Here there is added reason for applying the presumption of validity; for the regulation now challenged was adopted after notice and public hearing as the statute required."

■ Applying those rules to the petition in the Oro Fino case, and, indeed, to the original petition in the instant case, it is apparent that no facts were alleged sufficient to rebut the presumption of constitutionality operating in favor of Limitation Order L–208. The bare allegations that the regulation was "arbitrary" and "without reasonable justification", were totally inadequate to show that the real effect of the regulation was not to promote the public safety in time of war but was rather to deprive the owner of his property without due process and without any real or reasonable expectation that the ostensible purpose of the regulation would be thereby effected. See also Leventhal v. District of Columbia, 69 App.D.C. 229, 100 F.2d 94.

It is apparent that in its amended petition herein, plaintiff has attempted to cure the deficiency of its original petition, and the deficiency which made the Oro Fino petition vulnerable to defendant's demurrer. The amended petition alleges a full and detailed statement of facts in support of the ultimate conclusion alleged to the effect that the Order L–208 was arbitrary and thus constituted a deprivation of due process and a taking of plaintiff's property without just compensation. But defendant says that a consideration of the additional facts alleged would be futile because the United States can never be required to pay compensation for the exercise of a regulatory power; that the court is without jurisdiction to review the decisions of the War Production Board, and that in any event it is common knowledge that gold mining in time of war is a luxury injurious to the public safety as a waste of manpower and materials.

■ In the Oro Fino case we said that the Federal Government may, in the *proper* exercise of its police powers, greatly restrict the use of property without becoming liable under the Fifth Amendment. We did not say, as defendant appears to believe, that the United States will never be liable to pay compensation for damages caused by the exercise of a regulatory power. The amended petition herein, which we shall later analyze in detail, has presented generally a case where a segment of the mining industry has been singled out for the action complained of; that action, that is, the closing of the mines, was clearly intentional, and the interference resulting therefrom— the prohibition of plaintiff's use of his property to mine and sell gold—was the natural and probable consequence of such action, and this interference with plaintiff's property rights was a substantial one. Up to this point the amended petition has by the

facts alleged presented most of the elements requisite to establish a taking of private property. The only element usually present in a taking case and literally absent here is the element of positive invasion of plaintiff's property.[4] There is alleged here only a negative prohibition, or, stated in another way, the placing of a servitude upon the use by plaintiff of its property, and it is for that reason that defendant contends this action amounts only to a regulation and not a requisition. Such negative prohibitions embodied in statutes and regulations have been held, in a number of cases, to be unconstitutional and violative of due process. It is true that those cases, unlike the amended petition of plaintiff in this case, did not involve claims for just compensation, but involved actions by plaintiffs adversely affected to enjoin the taking threatened by the enforcement of the particular statute, regulation or order, or involved criminal prosecutions in which the unconstitutionality of the statute or regulation was asserted by way of defense. In some of those cases the negative prohibition was held to be unconstitutional because it was arbitrary and bore no reasonable relation to its ostensible purpose of protecting the public health, safety, or morals,[5] and the enforcement of the offending order was either enjoined, or the defense to the criminal charge was held to be good. In other cases, the negative prohibition was held, upon the facts, to be constitutional because it was not shown to be arbitrary but rather had a real relation to the purpose of protecting the public health, safety or morals.[6] It does not necessarily follow, however, that in the cases where the courts have held the regulation or statute to be unconstitutional as violative of due process,

just compensation would not have been decreed if an actual taking had been alleged, proved, and loss established, and this is the question involved in this and the related gold mine cases. A regulation which is unconstitutional as violative of due process because arbitrary, may well result in a taking of the property affected for which just compensation would be due to the extent of the value of the property rights so taken.

■ It seems clear that whether a regulation or a statute promulgated under the police power of the States, or under the war powers of the Federal Government, runs afoul of the Fourteenth or Fifth Amendments to the Constitution depends upon the facts in each particular case. In the case of Mugler v. Kansas, supra, referred to in the Oro Fino decision, the United States Supreme Court held, 123 U.S. at page 662, 8 S.Ct. at page 297, that the Kansas statute prohibiting the manufacture and sale of intoxicating liquor in that State was a proper and non-arbitrary exercise of the State's police powers because it was:

"* * * fairly adapted to the end of protecting the community against the evils which confessedly result from the excessive use of ardent spirits. * * * for we cannot shut out of view the fact, within the knowledge of all, that the public health, the public morals, and the public safety, may be endangered by the general use of intoxicating drinks; nor the fact established by statistics accessible to every one, that the idleness, disorder, pauperism, and crime existing in the country, are, in some degree at least, traceable to this evil."

---

4. An excellent analysis of the distinctions voiced by the courts between "regulations" and "takings" is contained in a Note (1950), 19 Geo.Wash.L.Rev. 184.

5. Thompson v. Consolidated Gas Utilities Corp., 300 U.S. 55, 57 S.Ct. 364, 81 L.Ed. 510; Berwind-White Coal Mining Co. v. United States, D.C., 9 F.2d 429; Louisville & Nashville R. R. v. United States, 242 U.S. 60, 37 S.Ct. 61, 61 L.Ed. 152; Chicago, Rock Island & P. Ry. Co. v. United States, 284 U.S. 80, 52 S.Ct. 87,

76 L.Ed. 177; Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L. Ed. 322.

6. Mugler v. Kansas, 123 U.S. 623, 8 S. Ct. 273, 31 L.Ed. 205; Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940; Perrin v. United States, 232 U.S. 478, 34 S.Ct. 387, 58 L.Ed. 691; Hamilton v. Kentucky Distilleries Co., 251 U.S. 146, 40 S.Ct. 106, 64 L.Ed. 194; Ainsworth v. Barn Ballroom Co., 4 Cir, 157 F.2d 97.

The Supreme Court, however, 123 U.S. at page 661, 8 S.Ct. at page 297, gave the following warning:

"It does not at all follow that every statute enacted ostensibly for the promotion of these ends [the protection of the public morals, health and safety] is to be accepted as a legitimate exertion of the police powers of the state. There are, of necessity, limits beyond which legislation cannot rightfully go. While every possible presumption is to be indulged in favor of the validity of a statute, Sinking Fund Cases, 99 U.S. [700,] 718 [25 L.Ed. 496, 504], the courts must obey the constitution rather than the law-making department of government, and must, upon their own responsibility, determine whether, in any particular case, these limits have been passed. * * * The courts are not bound by mere forms, nor are they to be misled by mere pretenses. They are at liberty, indeed, are under a solemn duty, to look at the substance of things, whenever they enter upon the inquiry whether the legislature has transcended the limits of its authority. If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the constitution."

In Thompson v. Consolidated Gas Utilities Corp., 300 U.S. 55, 57 S.Ct. 364, 81 L.Ed. 510, the court held that a gas proration order issued by the Railroad Commission of Texas for the Panhandle fields was violative of plaintiff's rights protected by the Fourteenth Amendment. Under the challenged order the production of natural gas from plaintiff's wells was limited to an amount below its market requirements under existing contracts, below its present production, and below the capacity of its transportation and marketing facilities. Plaintiff sought and obtained an injunction, charging that the purpose of so limiting its production was not, as declared in the order, to prevent waste, or the invasion of the legal rights of co-owners in the common reservoir, but was solely to compel plaintiff, and others similarly situated, to purchase gas from the well owners who had not provided themselves with a market and marketing facilities, and that the order took plaintiff's property without due process of law. Plaintiff therein did not contest the power of the State to legislate to protect natural resources, or to confer power on the Railroad Commission to make and enforce regulations to that end. In holding the regulation arbitrary and violative of plaintiff's rights under the Fourteenth Amendment, the court, 300 U.S. at page 69, 57 S.Ct. at page 371, stated:

"It is settled that to all administrative regulations purporting to be made under authority legally delegated there attaches a presumption of the existence of facts justifying the specific exercise. * * * But, obviously, the proration orders would not be valid if shown to bear no reasonable relation either to the prevention of waste or the protection of correlative rights, or if shown to be otherwise arbitrary. The plaintiffs have assumed the heavy burden of overcoming the presumption and of establishing that the order is an arbitrary taking of their property. * * * We think the plaintiffs have sustained the burden resting upon them."

In Berwind-White Coal Mining Co. v. United States, D.C., 9 F.2d 429, the court found certain car distribution regulations of the Interstate Commerce Commission confiscatory in violation of the Fifth Amendment to the Constitution in that they deprived the railroads of the use of their mines, and the private car owners of the use of their mines and cars, and constituted an unreasonable and arbitrary exercise of power. See also Louisville & Nashville R. R. Co. v. United States, 242 U.S. 60, 37 S.Ct. 61, 61 L.Ed. 152; Chicago, Rock Island & P. Ry. Co. v. United States, 284 U.S. 80, 52 S.Ct. 87, 76 L.Ed. 177; Jay Burns Baking Co. v. Bryan, 264 U.S. 504, 44 S.Ct. 412, 68 L.Ed. 813.

But defendant says that in this case the court cannot question the wisdom of the

War Production Board's decision that continued mining of gold was injurious to the war effort, citing our decision in the Oro Fino case, and the cases of Dakota Central Tel. Co. v. South Dakota, 250 U.S. 163, 184, 39 S.Ct. 507, 63 L.Ed. 910, and Ainsworth v. Barn Ballroom Co., 4 Cir., 157 F.2d 97. The principle which defendant appears to have in mind, and with which plaintiff does not quarrel, was discussed in Nebbia v. New York, 291 U.S. 502, at pp. 525 and 537, 54 S.Ct. 505, at pages 510 and 516, where the court said:

"The Fifth Amendment, in the field of federal activity, and the Fourteenth, as respects state action, do not prohibit governmental regulation for the public welfare. They merely condition the exertion of the admitted power, by securing that the end shall be accomplished by methods consistent with due process. And the guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary, or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained. It results that a regulation valid for one sort of business, or in given circumstances, may be invalid for another sort, or for the same business under other circumstances because the reasonableness of each regulation depends upon the relevant facts.

" * * * If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, * * * if the legislative policy be to curb unrestrained and harmful competition by measures which are not arbitrary or discriminatory it does not lie with the courts to determine that the rule is unwise. * * * and that though the court may hold views inconsistent with the wisdom of the law, it may not be annulled unless palpably in excess of legislative power."

See also United States v. Doremus, 249 U.S. 86, 39 S.Ct. 214, 63 L.Ed. 493; Perrin v. United States, 232 U.S. 478, 34 S.Ct. 387, 58 L.Ed. 691; Hamilton v. Kentucky Distilleries Co., 251 U.S. 146, 40 S.Ct. 106, 64 L.Ed. 194.

We have not been asked by plaintiff, nor have we the power, to pass on the wisdom of Order L-208. Plaintiff does not allege that the Board lacked the power to issue the order or that the order was invalid. The question raised by the facts alleged in the amended petition, and which we have authority to consider and decide, is whether, on the facts so alleged, the order in question went beyond what was required by the exigency of the situation existing in October 1942; bore no reasonable relation to its ostensible purpose of concern for the public safety in time of war, and was so arbitrary as to constitute a taking of valuable property rights belonging to plaintiff. See Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593. That gold mining in time of war is a luxury injurious to the public safety as a waste of manpower and materials is not, we think, a fact of which we may take judicial notice. Although defendant contends that such a fact is common knowledge, we believe it is rather a matter of proof.

We now turn to a consideration of the facts and circumstances alleged in plaintiff's amended petition to determine whether, on the basis of such facts, plaintiff is entitled to a trial on the merits to prove, if it can, that the order of the War Production Board was arbitrary and confiscatory.

Plaintiff alleges that whereas Order L-208 recited and purported on its face to be necessary and appropriate in the public interest, and to promote the national defense, for the preservation of critical materials for defense, for private account, and for export; which materials were used in the maintenance and operation of gold mines, numerous circumstances conclusively rebut the presumption that the order was reasonably calculated to accomplish such manifest purpose, and the order was in fact arbitrary and confiscatory.

It is alleged that the particular critical materials used in gold mining were, at the

time the order was issued and thereafter, subject to allocation and restriction by virtue of duly issued War Production Board priority regulations; that only a relatively small amount of critical material was actually used in gold mining; that the limitation order did not allocate, restrict or distribute materials or equipment, but merely prohibited the removal of any ore from plaintiff's mine, above or below ground; that notwithstanding the statement in the order that gold mining was nonessential to the national defense, mining equipment valued at more than $300,000,000 was produced and manufactured in the United States during the years 1942 through 1945, and exported to foreign countries; that to the extent of such exports, both the critical materials used and the manpower employed to produce such equipment, were diverted from national defense with the approval of defendant.

It is alleged that defendant at no time found or determined that gold mining was a public evil requiring regulation for the protection of the public peace, health or safety; that defendant prepared and issued the order hastily, without any notice to, or opportunity to be heard by, plaintiff or the gold mining industry who were thus deprived of their right to be heard on their own behalf by the War Production Board before the mines were summarily closed; that no other industry was directly and completely closed down by defendant during the war; that despite the fact that gold and silver are analogous metals with analogous uses for industry and as the basis of the national currency, the silver mines were allowed to operate at all times.

It is alleged that the true purpose of defendant in closing the mines was to alleviate the manpower shortage in the nonferrous metal mines, particularly the copper and zinc mines; that in issuing the order, the War Production Board did not exercise its own independent judgment, but acted under pressure from the War and Navy Departments; that as a manpower measure, the order was unenforceable and no attempt was ever made to so enforce it because no agency of the defendant, including the War Production Board, had the right or power to compel the transfer of labor from one employer to another, or from one industry to another.

It is further alleged that (1) any hope of defendant that the closing of the gold mines would cause gold miners to seek employment in the copper and other nonferrous metal mines was unreasonable and without foundation because many of the gold miners, including plaintiff's employees, were middle-aged or elderly men, with homes and families in the communities surrounding the gold mines, who would not voluntarily leave their homes and families to seek employment elsewhere when the gold mines were closed; (2) gold miners generally are in a class by themselves, have spent the better part of their lives in the gold mines in their own communities and have become intimately acquainted with the character of the rock formations and the underground workings of the mines in which they and their ancestors have worked; (3) the processes employed in mining gold are not the same as in hard rock mines; (4) specific techniques employed in gold mines vary from those of copper and other nonferrous mines; (5) gold miners work mainly narrow quartz veins in hard rock, whereas copper mines when worked underground, comprise mainly large deposits worked on a larger scale with complicated methods of timbering and stoping; (6) a gold miner would have to learn an entirely new type of ore deposit, master new drilling, blasting, timbering techniques, and become accustomed to a new set of underground hazards, to work in copper mines; (7) plaintiff's mine at Grass Valley, California, is at least a thousand miles from the nearest working copper mine; (8) working conditions and living conditions in Grass Valley were far better than those in the far distant copper mines; (9) most gold mining communities were largely, if not wholly, dependent upon the operation of the gold mines for their continued existence and prosperity. It is also alleged that on October 8, 1942, when Order L–208 was effective, plaintiff employed approximately 232 men, 137 of whom were underground workers; that 48 of such underground workers were over 50 years of

age, leaving 89 underground workers under 50 years of age; that the character of plaintiff's underground workings was such that it would have required all of the 137 underground miners then employed by plaintiff to maintain the access and development workings of plaintiff's mine safe and accessible as permitted by paragraph (b)(3) of Order L-208; that the character of the underground workings in substantially all other gold mines was such that all or nearly all of the underground workmen then employed in the gold mines would have been required to maintain their access and development workings safe and accessible, and thus by its very terms, Order L-208 would not have yielded a single underground miner for work in the nonferrous mines. It is further alleged that all these facts were either known to the War Production Board at the time it issued Order L-208, or could have been readily ascertained upon a reasonable investigation of the facts and circumstances. It is alleged that during the Winter of 1942–43, the Legislatures of Nevada, California, South Dakota and Alaska passed resolutions calling for the withdrawal of Order L-208, but despite the fact that the War Production Board knew that the gold mines were deteriorating rapidly, that underground workings were caving and collapsing, and the mines were being flooded, with consequent huge expense to the mine owners, no action was taken to rescind the order until June 30, 1945.

It is also alleged that any hope defendant may have had that closing the gold mines would alleviate the manpower shortage in the nonferrous metal mines was without any reasonable foundation for the further reasons that most of the nonferrous mines are located in Western States where mining and agriculture comprise the main industries; that at the time of the issuance of Order L-208 and thereafter, agricultural workers were being deferred and that the Selective Service quota of each of those Western States could only be made up by drafting miners from the nonferrous mines; that such nonferrous miners were in fact drafted in great numbers; that others left the poor working conditions and relatively low pay of such mines to work in war in-

dustries and at Army camps and cantonments; that the manpower shortage in the nonferrous mines was thus created by defendant which had the power and duty to correct and eliminate such underlying causes of the labor shortages without destroying plaintiff's property and the entire gold mining industry; that defendant knew, at the time it issued Order L-208, that its enforcement would not correct the manpower shortage which defendant itself was creating and fostering; that, in May 1944, the Policy Analysis and Records Branch of the War Production Board submitted a report to the War Production Board, pointing out specifically that Order L-208 was not achieving its hoped-for object, and that under the most favorable interpretation of labor statistics not more than one hundred gold miners had gone into nonferrous mines and remained for more than a year; that, in fact prior to the actual promulgation of the Order, the Chief of the Mining Branch of the Minerals Division of the War Production Board stated to other members of the War Production Board, that the Mining Branch of the Board viewed with serious alarm the proposed dissipation of the only appreciable resource of highly competent mining labor which would result through the proposed hasty closing of the gold mines; that in view of the fact that nonferrous miners were streaming from the copper and other nonferrous mines to the West Coast to seek more lucrative employment in the war industries, the War Production Board should be certain that this resource of highly competent mining labor employed in the gold mines should be directed toward the most critical points in some manner before the gold mines were closed. It is alleged that no steps to that end were taken by defendant prior to or after the issuance of Order L-208 closing the gold mines.

Based on the facts summarized above, plaintiff alleges that the action of the War Production Board was arbitrary and constituted a deprivation of due process and resulted in a taking of plaintiff's property and its right to mine and sell gold in violation of the Fifth Amendment to the Constitution, for which plaintiff alleges that it is entitled to just compensation.

As stated above, on a motion to dismiss for failure to state a cause of action, all facts well pleaded must be deemed to be admitted for the purpose of such motion, although this does not constitute an admission of such facts upon which judgment can be rendered without adequate proof. A careful consideration of the facts alleged, and a comparison of those facts with the facts considered by the courts in analogous cases,[7] persuades us that if plaintiff is able, by competent proof, to establish the existence of such facts, the result may follow that despite its ostensible purpose of protecting the public in time of war, the action of the War Production Board in issuing Limitation Order L–208 was not in fact reasonably calculated to accomplish such purpose and that no state of facts existed sufficient to justify the Board's order as an exercise of its war power, and that the action was in fact arbitrary. Under such circumstances as outlined in the petition, we believe the plaintiff is entitled to a trial on the merits to prove its claim that the action of the War Production Board was far more than a regulation and amounted to a taking of plaintiff's right to mine and sell gold. This is a valuable property right for which plaintiff would be entitled to just compensation under the Fifth Amendment to the Constitution, if there was a taking. United States v. Dickinson, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789. The establishment at a trial on the merits of proof of facts by plaintiff to rebut the presumption that the particular exertion of the Government's war powers represented by L–208 was justified, is a most difficult burden, and it may well be that even then, as in such cases as Hamilton v. Kentucky Distilleries Co., 251 U.S.

146, 40 S.Ct. 106, 64 L.Ed. 194, Perrin v. United States, 232 U.S. 478, 34 S.Ct. 387, 58 L.Ed. 691; and United States v. Doremus, 249 U.S. 86, 39 S.Ct. 214, 63 L.Ed. 493, defendant will come forward with sufficient facts to justify Order L–208 as a proper regulation. At this stage of the proceeding, however, plaintiff has alleged facts sufficient to constitute a cause of action within the jurisdiction of this court and defendant's motion to dismiss the amended petition must be overruled.[8]

It is so ordered.

JONES, Chief Judge, and HOWELL, MADDEN and WHITAKER, Judges, concur.

---

7. Chicago, Rock Island & P. Ry. Co. v. United States, 284 U.S. 80, 52 S.Ct. 87, 76 L.Ed. 177; Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593; Jay Burns Baking Co. v. Bryan, 264 U.S. 504, 44 S.Ct. 412, 68 L.Ed 813; Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322; Louisville & Nashville R. R. v. United States, 242 U.S. 60, 37 S. Ct. 61, 61 L.Ed. 152.

8. Defendant urges that insofar as the newly added counts in plaintiff's petition, or any changes in the allegations in the first count, purport to state a new cause of action, they are barred by the Statute of Limitations. A comparison of the original and amended petitions reveals that no new causes of action are presented by the amended petition. The division of the amended petition into three counts was merely a matter of organization of material already contained in the original petition.