Whitakek, Judge,
delivered the opinion of the court:
This is a suit by the State of California to recover the value of the land embraced within certain streets laid out in a subdivision of tide or submerged lands in the Bay of San Francisco. The United States of America took possession of the lands embraced within these streets and the abutting lots under a deed from the Columbia Steel Company dated November 14,1940.
The question at issue is whether or not title to the lands embraced within these streets passed by this deed. If not, the defendant took the lands shortly after the date of the deed under its power of eminent domain and is liable to pay the owner just compensation therefor.
The first question presented, however, is our jurisdiction to settle the controversy. Defendant says we have no jurisdiction because the suit was not brought within the time specified in the Act under which defendant consented to be sued. Before the Act of February 24, 1855 (10 Stat. 612), the defendant, as the sovereign, could not be sued by any one. By that Act a court was established to hear and determine certain claims against the Government. By the Act of March 3, 1863 (12 Stat. 765), this Act was amended broadening the powers of the court. Under these Acts the Government consented to be sued in this court in certain cases, but only on the condition that the action be brought within six years from the time it accrued. If not brought within six years, the defendant was immune from suit, as it had been prior to the passage of the Act, and this immunity was against a suit by any one, whether a private individual or State.
These Acts, however, made certain exceptions to the requirement that suit be brought within six years, and there are certain exceptions in the law today. These exceptions relate to claims of married women, minors, idiots and persons beyond the seas. Also, there have been certain decisions of the courts which apparently make exceptions to the time *157 when the statute begins to run. The statute requires that suit be brought within six years from the time it first accrued, but the Supreme.Court in United States v. Dickinson, 331 U. S. 745, held that, while suit might have been brought at an earlier date, the statute did not begin to run until the extent of the flooding of the lands could be ascertained. This court in Oro Fina Consolidated Mines, Inc., v. United States, 118 C. Cls. 18, cert. den. 341 U. S. 948, postponed the beginning of the running of the statute until the duration of the taking was ascertained.
In the case at bar the plaintiff says that the statute should not begin to run until it had notice, actual or constructive, that the defendant had taken its lands. The statute makes no such exception, but we shall assume for the purposes of this opinion that such an exception should be made; but we do not find it necessary to decide whether or not it should be made, because we think the plaintiff had notice of the taking by the defendant more than six years before it instituted its action.
As stated, defendant acquired the property by deed from the Columbia Steel Company on November 14, 1940, nearly ten years before this action was instituted. This deed expressly conveyed the area included in the streets. It read in part:
Eeference herein to any and all so-called streets is solely for the purpose of description in order to tie the same to the description of all adjacent lands and premises adjoining the lands herein described and shall not be taken as an admission of the existence of any streets whatsoever within the boundaries of the lands herein described, all as stated in the Grantor’s warranties herein set forth, hereby granting, bargaining, selling and conveying the fee simple absolute title to the above described lands, and all improvements thereon, clear of all mineral rights, streets, highways,, easements, restrictions, leases, judgments, taxes and assessments, existing or inchoate, liens or encumbrances of any sort at the date of the transfer of the title to the United States.
This deed was duly recorded.
Under a contract dated September 9, 1940, defendant entered into what was called a facilities contract with the *158 Bethlehem Steel Company, providing for the expansion of the shipyard of the Bethlehem Steel Company to include the lands acquired by defendant from the Columbia Steel Company. Pursuant thereto Bethlehem Steel. Company went into possession of the lands in suit and erected facilities thereon.
Thus; since November 14, 1940, defendant has been in open and notorious adverse possession of the lands under a claim of right..
Ever since April 27, 1900, when the Pacific Bolling Mill Company conveyed the lands to the Bisdon Iron and Locomotive Works, the grantees of the lands have claimed title under deeds which included the streets in question. Thus, for fifty years before the bringing of the present action, parties in possession of these lands have claimed title to the area embraced within the streets. In fact, the streets existed only on paper. They had never been laid out, since the lands were tide or submerged lands.
In addition to the above, one month before the execution of the deed from Columbia Steel Company to the defendant, and apparently in contemplation of its execution, the Board of Supervisors of the City and County of San Francisco adopted Besolution 1376, which “closed and abandoned” all the streets in the area except Massachusetts Avenue and.a portion of Twenty-first Street or Shasta Street.
All the foregoing facts we think put the plaintiff on notice that defendant had taken its lands on the date of the deed to defendant and possession of the property by the Bethlehem Steel Company.
Plaintiff, however, says that no one can acquire title by adverse possession against a State and, therefore, a State is not required at its peril to take notice of the possession of its property by any one else. Plaintiff in its brief thus states the rule applicable to private owners. On pages 162 and 163 of its reply brief it states:
It is frequently asserted to be the general rule that an owner of real property is presumed to know who1 is in occupancy thereof. This presumption gives rise to the rule that an owner of land has a duty to make reasonable investigation to determine the nature of the occupancy by another party and in the absence of such investiga *159 tion will be held to constructive notice of facts which could have been discovered by such reasonable investigation. Accordingly, the statute of limitations applicable to actions for the recovery of real property will ordinarily run against an owner even though he does not receive actual knowledge of the hostile claim where he has failed to investigate the nature and extent of occupancy of his property by other persons. This doctrine raises the question whether the plaintiff herein should be held to have had constructive notice of the claims of the United States merely because Bethlehem entered into occupancy of the lands.
However, it says that a State is not concerned about the occupancy of its property until the State is ready to use it itself, because, it says, the State can at any time eject the squatter, however long he may have occupied it; hence it says that vigilance is not required of the State and it is not affected by adverse possession even though it be open and notorious.
We think this is perhaps a correct statement of the law, but it does not apply as against the United States. The United States may go into possession of the property of a State and may successfully resist an action by the State to .eject it. Therefore, if the occupation is by the Federal Government, the State is obliged to take notice of it, and, hence, it follows that if the State learned that any one is occupying its property, it must ascertain, at its peril, whether or not they occupy it for and on behalf of the United States, or under a claim of right acquired from the United States.
Here the occupancy was by one under the authority of the United States, which claimed title under a duly recorded deed. The State could not ignore such occupancy. Possession by one under the authority of the United States is a peril against which the State must guard, just as an individual must guard against adverse possession by anyone.
It is well settled that the Federal Government may acquire by eminent domain property already devoted by a State to a public use. United States v. Carmack, 329 U. S. 230; Oklahoma v. Atkinson Co., 313 U. S. 508, 534; Wayne County v. United States, 53 C. Cls. 417, aff’d. 252 U. S. 574.
In the fifty years before this suit was brought, five deeds were recorded granting title to the lands claimed by plain *160 tiff. Plaintiff might have disregarded them all, except the one conveying title to the United States, but it was obliged to take notice of the possession of the property under this one because the United States had the right to acquire even property devoted by the State to a public use; and, hence, the State could not sit back and wait until it decided to use the property and then eject the United States.
Therefore, the failure of the State to bring its suit within six years from the time the United States recorded its deed to the property and the Bethlehem Steel Company went into possession under it bars it from suit in this court.
It is settled that the six-year statute of limitations on the filing in this court of a petition on a claim against the United States is applicable to a claim by a state. United States v. Louisiana, 127 U. S. 182, 192.
Besides, by the several Acts authorizing grants of these tide and submerged lands, the dedication of streets was called for, and the maps filed pursuant to these Acts laid off these streets. By the California statute of March 30, 1868, establishing a Board of Tide Land Commissioners, it was directed that the lands be surveyed and maps prepared “exhibiting all the municipal subdivisions, streets, alleys, blocks, squares and lots,” and they were authorized to sell the lots, “reserving so much thereof for streets * * * as in their judgment may be required.” This was done, and the lots abutting on the streets in question were sold. Authority over the streets reserved was vested in the City and County of San Francisco by the Legislature; hence, notice to the City and County of the taking by the defendant of the land embraced within the streets was notice to the State.
The resolution of the Board of Supervisors of the City and County of San Francisco, closing and abandoning these streets, was no doubt induced in large part by the fact that the street areas had been included in deeds to the property for forty years and no street had ever been opened in them, and no doubt also in contemplation of the deed by the Columbia Steel Company to the United States. At any rate, this deed to the United States followed the passage of this resolution by a month.
*161 We cannot escape the conclusion that the City and County had notice of the deed to the United States and that this deed included within its grant the lands embraced in the streets. Notice of these facts by the City and County was notice to the State.
Counsel for both parties have filed excellent briefs on the merits, from the reading of which we have derived pleasure and profit. We regret that authority has not been granted us to decide the issues presented.
Plaintiff’s petition will be dismissed on the ground that its action is barred by the statute of limitations.
Laramore, Judge; MaddeN, Judge; Littleton, Judge; and JoNes, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Koald A. Hogenson, and the briefs and argument of counsel, makes findings of fact as follows:
1. The People of the State of California, hereinafter referred to as the plaintiff, seek to recover from the United States the value of certain lands in the City and County of San Francisco which they allege were owned by the State of California but which were permanently appropriated by the United States without condemnation or compensation. The United States took possession of the disputed lands as a part of a comprehensive tract, known as the Nisdon Yard, which it purchased from the Columbia Steel Company under deed dated November 14, 1940. The principal issue in the case is the ownership of the disputed portions of the Kisdon Yard.
The lands in issue were tide or submerged lands in the Bay of San Francisco on September 9,1850, when California was admitted into the Union. Upon becoming a State, ownership of these lands vested in the State of California by virtue of its sovereignty. The State claims that it had never conveyed or lost title to these lands until they were taken and permanently appropriated by the United States , and that it is entitled now to payment.
*162 All of the lands in issue were shown as streets upon the maps, pursuant to which the State granted and conveyed the adjoining lots and blocks. The United States claims under its deed from Columbia Steel Company, contending that title passed to its predecessors in interest by virtue of the State’s patent and deeds conveying the adjoining lots or blocks. The United States further claims that its predecessors in interest acquired title to the disputed lands by adverse possession or prescription.
With the approval of the commissioner, the parties have reserved the question of the value of the lands, and limited the trial of the case to the issues of law and fact pertaining to the right of the plaintiff to recover.
2. Upon admission of California into the Union of States on September 9, 1850, all of the property conveyed as set forth in Findings 4, 7, 8 and 9 of this report were tide or submerged lands situate in the Bay of San Francisco and, as such, title thereto became vested in the State of California by virtue of its sovereignty.
3. A survey was conducted and plat prepared by Wm. J. Lewis under date of June 1856, and recorded in the office of the County Becorder of the City and County of San Francisco under date of March 21, 1864, in Books “C” and “D” of Maps at pages 78 and 79, covering the submerged lands involved in this case, together with additional lands. A copy of the plat is in evidence as Exhibit No. 1. The Lewis map was prepared' to subdivide into blocks and streets the areas included within the claim of Bamon and Francisco de Haro based upon a Mexican land grant known as the Bancho del Potrero Nuevo. The Lewis map in addition to subdividing the said claim also extended the plan of subdivision beyond the boundaries of the grant and over and into the Bay of San Francisco to a point which is beyond the line of 12 feet of water. A copy of a portion of the Lewis map covering the area in litigation is reproduced in this report.
• Confirmation of the Bancho del Potrero Nuevo grant was sought in the United States courts and denied by said courts. No patent based upon the grant was issued by the United States. The area depicted in the Lewis map landward of *163 the line of mean high tide was instead confirmed by the United States courts as Pueblo lands of San Francisco.
4. By Statutes of California 1865-66, chap. 616, page 841, it was provided by legislation entitled “An Act to authorize the sale and conveyance to William Alvord, his associates and assigns, of certain overflowed lands in the City and County of San Francisco,” approved April 2, 1866, as follows:
William Alvord, his associates and assigns, are hereby authorized to have a survey made at their own expense, by the City and County Surveyor of San Francisco, of certain submerged and tide and marsh lands belonging to the State, situated in the City and County of San Francisco, to wit: Blocks numbered upon the map or plan of the “Potrero Nuevo,” made by William J. Lewis in June, (1856), Eighteen hundred and fifty-six. Four Hundred and Eighty-six, Four Hundred and Eighty-seven, Five Hundred and Six, and Five Hundred and Seven, being bounded on the north by Butte Street, on the west by Maryland Street, on the south by Shasta Street, on the east by Massachusetts Street, and containing in all not to exceed 8 acres; and upon the approval of his survey by the Surveyor-General and upon the payment by said Alvord, his associates or assigns, to the Treasurer of the State, to the credit of the “Wharf and Dock Fund,” the value of said land after the same has been ascertained by the State Harbor Commissioners, at a sum of not less than one hundred dollars per acre, for the number of acres so ascertained, the Begister of the State Land Office shall certify said approval and payment to the Governor, whereupon a patent shall issue for said land to said Alvord; provided, this description shall not include more than the blocks numbered upon the aforesaid map Four Hundred and Eighty-six, Four Hundred and Eighty-seven, Five Hundred and six, and Five Hundred and seven, with the adjacent streets; * * *
Section 3. Any wharf or dock which may be built on said lots or on the aforesaid described property shall be subject to the same laws, rules, and regulations as govern other wharves under the supervision of the State Harbor Commissioners.
Pursuant thereto, a survey known as Tide Land Survey No. 57 (Exhibit No. 2) was made. The plat or diagram for the survey represents Blocks 486, 487, 506, and 507 as they

*164

*165 appear on the Lewis map. Massachusetts, Delaware and Maryland Streets are represented running in a northerly and southerly direction, and Shasta, Napa and Butte Streets are represented as running in an easterly and westerly direction, substantially as they appear on the Lewis map. The extreme southwest corner of Block 487 is omitted because it lies on the highland rather than in the tide or submerged lands. The blocks are numbered 1, 2, 3, and 4, for Lewis map blocks 487, 486, 506 and 507, respectively. Tide Land Survey No. 57 contains the following notations and descriptions :
County Surveyor’s Office, San Francisco County, Cal. Swamp and Overflowed and Salt Marsh and Tide Lands. Survey No. 57, Township 2 South, Kange 5 West, Section 14, fractions in S.E.14 of the lSf.W.14 of Section 14.
Base and Meridian of Mount Diablo containing 7.24 acres surveyed June 7th 1866, for William Alvord and associates.
FIELD NOTES
No. 1. Beginning at a point 36.91 chains South and 23.38 chains East of the South East corner of Section 10 in Township 2 South, Range 5 West, Base and Meridian of Mount Diablo, thence N. 85^2° E. 108 feet and 4 inches, N. 4y2° W. 400 feet, S. 85y2° W. 200 feet, S. 41/2° E. 349 feet and 4y2 inches, S. 65%° E. 104 feet and
9 inches to the place of beginning, containing 1 732/1000 acres.
No. 2. Beginning at a point 29.97 chains South and 21.45 chains East of the South East corner of Section 10 in Township 2 South, Range 5 West, Base and Meridian of Mount Diablo, thence N. 85%° E. 200 feet, N. 41/2° W. 400 feet, S. 851/2° W. 200 feet, S. 4%° E. 400 feet to the place of beginning, containing 1 836/1000 acres.
No. 3. Beginning at a point 36.68 chains South and 26.23 chains East of the South East corner of Section 10 in Township 2 South, Range 5 West, Base and Meridian of Mount Diablo, thence N. 85%° E. 200 feet, N. 41/2° W. 400 feet, S. 85i/2° W. 200 feet, S. 4%° E. 400 feet to the place of beginning, containing 1 836/1000 acres.
No. 4. Beginning at a point 29.64 chains South, and 25.68 chains East of the South East corner of Section 10 in Township 2 South, Range 5 West, Base and *166 Meridian of Mount Diablo, thence N. 85%° E. 200 feet, N. 4%° W. 400 feet, S. 86%° W. 200 feet, S. 4%° E. 400 feet to the place of beginning, containing 1 836/1000 acres; embracing a portion of Survey No. 28 heretofore returned to the State Surveyor-General. Run by the true meridian: magnetic variation 16° East.
Surveyed in accordance with the Acts of the Legislature concerning Swamp and Overflowed Lands, and especially an Act entitled an Act “To authorize the sale and conveyance to William Alvord, his associates and assignes, of certain overflowed lands in the City and County of San Francisco,” approved April 2nd, 1866, and the instructions of the Surveyor-General.
Signed G. C. Potter,
County Surveyor,
San Francisco County.
By Statutes of California, 1867-68, ch. 362, p. 432, setting forth “An Act to authorize the sale and conveyance to the Pacific Rolling Mill Company of certain overflowed lands in the City and County of San Francisco”, approved March 28, 1868, the Pacific Rolling Mill Company was authorized to have a survey made at its own expense of
Certain submerged and tide and marsh lands belonging to the state, situated in the City and Comity of San Francisco, to wit: All the northerly three fourths of Block Numbered Five Hundred and Five, as laid down on a certain map or plan of the Potrero Nuevo, made by William J. Lewis, in June 1856 * * * and upon the approval of his survey by the Surveyor-General, and upon the payment by said Pacific Rolling Mill Company to the Treasurer of the State, to the credit of the Wharf and Dock Fund, the value of said land at the rate of not less than Three Hundred Dollars per acre for the number of acres so ascertained. The Register of the State Land Office shall certify said approval and payment to the Governor, whereupon a patent shall issue for said lands to said Pacific Rolling Mill Company * * *.
Section 2. Any wharf or dock built on the aforesaid described.property shall be subject to the same laws, rules and regulations as govern other wharves under the supervision of the State Harbor Commissioners.
Pursuant thereto a survey known as Tide Land Survey No. 63 (Exhibit No.' 3) was made. The sketch appended to .the survey shows Massachusetts and Delaware Streets *167 running in a northerly and southerly direction and Sierra and Shasta Streets running in an easterly and westerly direction substantially as they appear on the Lewis map. It also bears a designation “505” in the center of the block. The legend on the survey reads:
Surveyed in accordance with an act to authorize the sale to the Pacific Rolling Mill Company of certain Overflowed Lands in the City and County of San Francisco, approved March 28, .1868.
Tide Land survey No. 63
• Township 2 South, Range 5 West being part of the SE% of the NW14 and the NE% of the SW% of section 14, Base and Meridian of Mount Diablo containing 1 37/100 acres surveyed August 1868 For the Pacific Rolling Mill Company.
MELD NOTES
Beginning at a point 13.69 chs. west 2.32 chs. due north of the centre of section 14, Township 2 South, Range 5 West, thence North 85° 30' East 3.03 chs. thence South 4° 30' East 4.54 chs. thence South 85° 30' West 3.03 chs. thence North 4° 30' West 4.54 chs. to the place of beginning containing 1 37/100 acres, said land being more particularly described as the northerly three fourths (%) of Block No. 505 of the Potrero Nuevo, /s/ Wm. P. Humphreys, City and County Surveyor, approved September 22nd, 1868. /s/ John W. Bost, Surveyor-General.
On January 29, 1869, the Pacific Rolling Mill Company in accordance with the statutes set forth in this Finding, petitioned the Governor of the State of California for issuance of a patent covering blocks 486, 487, 506, 507, and the northerly three-fourths of block 505, as shown on the Lewis map. The petition is in evidence as Exhibit No. 4.
Pursuant to the above statutes, surveys and petition, a patent dated February 27, 1869, was issued to the Pacific Rolling Mill Company (Exhibit No. 5), which was recorded in the office of the County Recorder of the City and County of San Francisco, State of California, on May 9, 1869, in Liber 1 of Patents, at page 47, and reads as follows:
*168 TOUTED STATES OF AMERICA, STATE OF CALIFORNIA
To all to whom these presents shall come greeting:
Whereas, the Legislature of the State of California has provided for the sale and conveyance of certain Tide and Marsh Lands in the City and County of San Francisco by Statutes entitled, “An Act to authorize the sale and conveyance to William Alvord, his associates and assigns, of certain overflowed lands in the City and County of San Francisco,” approved April 2nd, A. D. 1866, and “An Act to authorize the sale and conveyance to the “Pacific Rolling Mill Company” of certain overflowed lands in the City and County of San Francisco” approved March 28th, A. D. 1868: And Whereas, it appears by the certificate of the Controller of State, bearing date January 28th, A. D. 1869, that full payment has been made to the State for the lands granted to the “Pacific Rolling Mill Company”; and satisfactory evidence having been furnished, that the said “Pacific Rolling Mill Company” are entitled to receive a Patent for the Lands described in said enactments, the same being situated in the City and County of San Francisco, and more particularly described as follows, to wit:
Blocks No. Four hundred and eighty-six (486), Four hundred and eighty-seven (48V), Five hundred and six (506), and Five hundred and seven (507), being bounded on the North by Butte Street, on the West by Maryland Street, on the South by Shasta Street, and on the East by Massachusetts Street; Also the Northerly three-fourths of Block No. Five hundred and five (505), as laid down on the Map or Plan of “Potrero Nuevo,” made by Wm. J. Lewis in June 1856. The land in Block No. Five hundred and Five (505) is described in the Field Notes of Tide Land Survey No. 63, made by the County Surveyor of the City and County of San Francisco in August A. D. 1868, as follows, to wit: beginning at a point 13.69 chains West, 2.32 chains North of the Centre of Section 14, Township 2 South, Range 5 West of Mount Diablo Meridian; thence North 85° 30' East 3.03 chains: thence South 4° 30' East 4.54 chains, thence South 85° 30' West 3.03 chains; thence North 4° 30' West 4.54 chains to the place of beginning, Containing One 37/100 (1.37) Acres, Magnetic Variation 16° 00' East.
Now, therefore, the State of California hereby grants to said “Pacific Rolling Mill Company,” and their associates and assigns, all the above described Lands, with *169 tbe appurtenances thereunto belonging, to have and to hold unto the said “Pacific Rolling Mill Company” and their associates and assigns, their heirs and assigns forever.
In testimony whereof I, H. H. Haight, Governor of the State of California, have caused these Letters to be made patent and the seal of the State of California to be hereunto affixed.
Given under my hand at the City of Sacramento, this the 27th day of February in the year of our Lord One thousand eight hundred and sixty-nine. (signed) H. H. Haight, Governor of State, attest (signed) H. D. Nichols, Secretary of State, (countersigned) John W. Bost, Surveyor-General and Register, State Land Office.
5. By Statutes of California, 1867-68, ch. 643, p. 716, “An Act to survey and dispose of certain salt marsh and tide lands belonging to the State of California” approved March 30, 1868, the Governor of the State of California was directed to appoint a Board of Tide Land Commissioners. Section 4 of the Act provides:
The Commissioners shall take possession of all the salt marsh and tide lands, and lands lying under water, * * * situate along the Bay of San Francisco, and situate in the City and County of San Francisco, belonging to the State of California, and have the same surveyed to a point not beyond twenty-four feet water at the lowest stage of the tide, and cause to be prepared two maps of the same, showing the quantity and extent of the property situated as aforesaid, and exhibiting all the municipal subdivisions, streets, alleys, blocks, squares and lots, * * * the Commissioners shall have all the property lying within the same belonging to the State surveyed, subject to the approval of the State Board, into lots and blocks in accordance with the official map survey of the City of San Francisco, reserving so much thereof for streets, docks, piers, slips, canals, drains, or other use necessary for the public convenience and the purposes of commerce, as in their judgment may be required, and have two maps of the same prepared showing the property as re-surveyed to the water line front, the streets, blocks, reservations, and everything necessary to be shown by such maps; one of which maps shall be filed in the Surveyor-General’s office, and the other shall remain in their office at San Francisco; * * *
*170 The Commission was duly appointed and caused the survey to be made and a map prepared. Received in evidence as Exhibit No. 6, this map depicts the pertinent streets and blocks, as they are shown in the reproduced portion of the Lewis map, supra, and also subdivides some of the blocks into lots.
6. The statute referred to in the preceding paragraph also provided in part as follows :
Section 5. After the Commissioners shall have complied with the provisions of section 4 of this Act, they shall proceed to sell at public auction, and as hereinafter provided, in some public place in the City of San Francisco, all the right, title, and interest of the State of California in and to the property in the lots described in section four. Such sales shall be by lots, in accordance with the survey and map provided for in section four of this Act; provided, that in all cases where any settler was on the first day of January, A. D. eighteen hundred and sixty eight, in the bona fide actual possession of any one lot by himself or tenant, and any additional lot in which he shall have had substantial improvements at the time aforesaid, or who had, within one year previous to the first day of January, A. D. eighteen hundred and sixty eight, substantial improvements upon any such lot which have been destroyed by fire, The Commissioner may appraise the value of such lot or lots without the improvements, after sufficient sales have been made to furnish a proper standard of value; and at any time within sixty days after such appraisement such settler may purchase such lot or lots by paying twenty five per cent, of the appraised value thereof at the time of such purchase, and the residue of such appraised value in three equal instalments, in one, two and three years, with interest as hereinafter provided; but the words “substantial improvements,” as used in this Act, shall not be construed to mean or include any bridge, wharf, fence, or piles driven in the land, capped or otherwise. Such sale shall be conducted in accordance with and under such rules and regulations as the State Board shall prescribe ; and provided also, that all sales made under the Erovisions of this Act, whether at private or public sale, ef ore they shall be deemed complete, shall be approved by the State Board, such approval to be made within sixty days after the report of such sale shall be filed with the State Board. When such sale shall not be thus approved, such lot or lots shall be subject to resale by the *171 Board of Commissioners, and the money paid by the purchaser at such disapproved sale shall be returned to him.
7. In accordance with the terms of the Act of March 80, 1868, and on November 17, 1871, Lots 8, 9,10,11,12,13 and 14 and fractional lots 6, 7, 15 and 16, all in Block No. 480 were sold by the Board of Tide Land Commissioners at private sale to B. P. Brunner. The sale was recorded in Book II of “Record of Salt Marsh & Tide Lands in the City & County of San Francisco” (Exhibit No. 7) at page 26, as follows:

Record of Salt Marsh and Tide Lands Situate in the Gity and County of San Francisco, California

On the reverse side of page 26, there was drawn a plat of the lots sold to B. P. Brunner, which plat is reproduced in this report.
The sale to Brunner was duly accounted for in Book 11 of Sales of Salt Marsh and Tide Lands (Exhibit No. 8) at page 10.
A description of the lots sold to said Brunner was prepared and entered in “Book N Descriptions of Salt Marsh and Tide Lands Situate in the City and County of San Francisco and in the Counties of Marin, San Mateo, Alameda and Contra Costa — Sold at Private Sale by the Board of Tide Land Commissioners” (Exhibit No. 9), said description being the same in all material respects as that set forth in the deed related in the following paragraph.
The Board of Tide Land Commissioners signed and executed a deed (Exhibit No. 10) dated November 17,1871, conveying all the right, title and interest of the State of California in the premises to Brunner. The deed recited the consideration and described the land as follows:
Beginning at the South East corner of Napa and Louisiana Streets: thence Easterly along the Southerly line of Napa Street two hundred (200) feet; thence

*172

*173 Southerly at right angles along the Westerly line of Maryland Street two hundred and ninety five (295) feet to the original shore line of San Francisco Bay at ordinary high tide: thence along said shore line according to the true meridian N. 62° W. one hundred and forty seven (147) feet and five (5) inches N. 75'%° W. eighty (80) feet to the westerly- [easterly?] line of Louisiana Street: thence Northerly along the last named line one hundred and ninety (190) feet to the place of beginning.
Being full lots eight (8) nine (9) ten (10) eleven (11) twelve (12) thirteen (13) and fourteen (14) and fractional lots six (6) seven (7) fifteen (15) and sixteen (16) in Block four hundred and eighty (480) and containing forty seven thousand and fifty six (47,056) square feet, according to the Map of the survey provided for in Section Four of said Act, entitled a “Map of the Salt Marsh and Tide Lands, and Lands lying under Water, South of Second Street, and situate in the City and County of San Francisco,” which map is on file in the Office of the State Surveyor, duly certified to by the said Board of Tide Land Commissioners, and approved by the several members of the “State Board” named in said Act, a duplicate map of said survey being retained and filed by said Commissioners in their Office in San Francisco.
Together with all and singular the tenements, heredi-taments and appurtenances thereunto belonging, or in any wise appertaining, which is the property of the State of California; and the reversion and reversions, remainder and remainders, rents, issues, and profits thereof; and also all the estate, right, title, interest, property, possession, claim, and demand whatsoever, as well in law as in equity of the said parties of the first part, of, in, or to the above described premises, and every part and parcel thereof, with the appurtenances.
The deed was properly acknowledged and was recorded in the county records of the City and County of San Francisco on October 22,1874 in Liber 755 of Deeds at page 229.
8. In accordance with the terms of said Act of March 30, 1868, and on November 14, 1871, fractional Lots 12 and 13 and part of Lot 14, all in Block 489, and Lots 8, 9,10,11,12 and 13, and a part of Lots 7 and 14, all in Block 504, and Lots 1 and 2 and fractional Lots 3 and 4, all in Block 505, were sold by the Board of Tide Land Commissioners at private sale to W. H. Taylor. The sales were recorded in Book *174 II of “Record of Salt Marsh & Tide Lands in the City & County of San Francisco” (Exhibit No. 7), at page 18, showing that the sale of the tidelands was approved by the State Board and that the original amount paid (25 percent of the total price) was $556.78.
On the reverse side of page 18, there was drawn a plat showing the pertinent blocks and adjacent streets, and designating in the blocks the particular lots, fractional lots and parts of lots sold to W. H. Taylor, in the same manner as depicted in the reproduced' plat of land sold to Brunner, supra. See sheet 8, Exhibit No. 7.
The sales to W. H. Taylor were duly accounted for in Book 11 of “Account of Sales of Salt Marsh and Tide Lands” (Exhibit No. 8) at page 6.
Descriptions of the lots sold to W. H. Taylor were prepared and entered in the above-mentioned Book N Descriptions (Exhibit No. 9), said description being as follows:
3d Series, Stub No. 60 Nov. 14th, 1871, Amount $2,227.12 25% $556.78 Fract. Lots 12 & 18 & Part of Lot 14 in Block No. 489:
W.H. Taylor.
_ Beginning at the South West corner of Sierra and Delaware Streets; then Southerly along the Westerly line of Delaware Street One hundred and Fifty Four (154) feet; thence Westerly at right angles parallel with Sierra Street Eighty Seven (87) feet Four (4) inches to the original Shore line of San Francisco Bay at ordinary high tide; thence along said Shore line according to the true meridian North 36'%° East Seventy One (71) feet Ten (10) inches; North 4*4° West One Hundred (100) feet to the Southerly line of Sierra Street; and thence Easterly along the Southerly line of Sierra Street Forty (40) feet to the place of beginning.
Deed:
Being fractional Lots numbered Twelve (12) and Thirteen (13) and part of Lot Fourteen (14) in Block numbered Four Hundred and Eighty Nine (489) and containing 7,440 square feet.
Lots 8, 9,10,11,12, & 13 & parts of Lots 7 & 14 in Block 504:
Also Beginning at the South West corner of Sierra and Water Front Streets, thence Southerly along the Westerly line of Water Front Street One Hundred and *175 Fifty Four (154) feet; thence Westerly at right angles Two Hundred (200) feet to the Easterly line of Delaware Street; thence Northerly at right angles along the E’ly line of Delaware Street One Hundred and Fifty Four (154) feet to the Southerly line of Sierra Street; and thence Easterly along the last named line Two Hundred (200) feet to the place of beginning.
Being Lots numbered Eight (8), Nine (9), Ten (10), Eleven (11), Twelve (12) and Thirteen (13) and parts of Lots Seven (7) and Fourteen (14) in Block numbered Five Hundred and Four (504) and containing 30,800 square feet.
Lots 1 & 2
fracl. Lots 3 & 4 in Block 505:
Deed:
Also Beginning at the North West corner of Sierra and Water Front Streets; thence Westerly along the Northerly line of Sierra Street One Hundred and Eighty Three (183) feet to the original Shore line of San Francisco Bay at ordinary high tide; thence along said Shore line according to the true meridian North 59%° East Fifty Seven (57) feet; North 38%° West Ninety (90) feet and Six (6) inches; thence Easterly parallel with Sierra Street One Hundred and Eighty Two (182) feet to the W’ly line of Water Front Street; and thence Southerly at right angles along the last named line One Hundred (100) feet to the place of beginning. Being Lots numbered One (1) and Two (2), and fractional Lots numbered Three (3) and Four (4) in Block numbered Five Hundred and Five 505, containing 15,578 sq. ft.
The Board of Tide Land Commissioners signed and executed a deed dated November 17, 1871, conveying all of the right, title and interest of the State of California in the premises to W. H. Taylor, the descriptions in the deed being identical with those last hereinabove set forth.
9. In accordance with the terms of the Act of March 30, 1868, and on November 18,1871, Lots 6, 7, 8, 9,10,11,12 and 13 and fractional Lots 5,14,15 and 16, all in Block 461, were sold by the Board of Tide Land Commissioners at private sale to Maurice Dore. The sale was recorded in Book II of “Becord of Salt Marsh & Tide Lands in the City & County of San Francisco” (Exhibit No. 7) at page 34, showing that the sale of these tidelands was approved by the State Board, *176 and that the original amount paid (25 percent of the total price) was $699.
On the reverse side of page 34, there was drawn a plat showing Block 461 and adjacent streets, and within the block the particular lots sold to Maurice Dore. See sheet 7, Exhibit No. 7.
The sales to Maurice Dore were duly accounted for in Book 11 of “Account of Sales of Salt Marsh and Tide Lands” (Exhibit No. 8) at page 18.
A description of the lots sold to Maurice Dore was prepared and entered in the above-mentioned Book N of Descriptions (Exhibit No. 8) as follows:
Stub No. 91 Nov. 18th, 1871, 3d Series Maurice Dore. Am’t. $2,796.00 25% $699.00 Full lots 6, 7, 8, 9,10, 11,12 & 13, and Fractional lots, 5,14,15 & 16. Block 461, Mission Bay
Deed:
Maurice Dore.
Beginning at the South East Corner of Napa and Georgia Streets; thence Easterly along the Southerly line of Napa Street 200 feet; thence Southerly along the Westerly line of Louisiana Street 167 feet 2% inches to the original Shore Line of San Francisco Bay at ordinary high tide; thence along said shore line according to the true meridian S. 83° % W. 80 feet, S. 4y2° E. 105 feet; S. 85%° W. and parallel to Napa St. 120 feet to the Easterly line of Georgia Street; thence Northerly along the last named line 275 feet to the place of beginning, being full lots 6, 7, 8, 9, 10, 11, 12, & 13, and fractional lots 5,14,15 & 16 in Block 461, and containing 46,600 square feet.
The Board of Tide Land Commissioners signed and executed a deed dated November 18, 1871, conveying all of the right, title and interest of the State of California in the premises to Maurice Dore, the description used in said deed being identical with the one last hereinabove set forth.
10. Section 3 of Article XY of the 1879 Constitution of the State of California reads:
All tide lands within two miles of any incorporated city or town in this State, and fronting on the waters of any harbor, estuary, bay, or inlet, used for the purposes of navigation, shall be withheld from grant or sale to private persons, partnerships, or corporations.
*177 11. Whatever passed to the State’s patentee and grantees by the foregoing patent and deeds, that is, by
(a) the patent of February 27, 1869, to Pacific Polling Mill Company,
(b) the deed from the Board of Tide Land Commissioners to B. P. Brunner, dated November 17,1871,
(c) the deed from the Board of Tide Land Commissioners to W. H. Taylor, dated November 14, 1871, and
(d) the deed from the Board of Tide Land Commissioners to Maurice Dore, dated November 18,1871,
passed to and became vested in the United States of America by mesne conveyances, the last five of which are described in Finding 12 of this report.
The lands in dispute are the street areas immediately adjacent to the particular blocks and parts of blocks conveyed by the State of California by the patent and deeds.
12. On April 27, 1900, the Pacific Polling Mill Company executed a deed to the Pisdon Iron and Locomotive Works (Exhibit No. 11), which deed was recorded in the office of the Recorder of the City and County of San Francisco, California, on December 81,1901, in Liber 1935 of Deeds at page 142. The description used in the deed appears as follows:
Commencing at a point formed by the intersection of the center line of Nineteenth Street (formerly Butte Street) with the center line on Maryland Street; running thence Southerly and along said center line of Maryland Street to the center line of Twentieth Street (formerly Napa Street) ; thence Westerly along said center line of said Twentieth Street to the center line of Louisiana Street; thence Southerly along said center line of Louisiana Street to a point which is one hundred and thirty-one feet eight inches Southerly from the Southerly line of said Twentieth Street; thence at a right angle Westerly and parallel with said Southerly line of said Twentieth Street One hundred and thirty-five feet three and one-half inches to a point which is Ninety-five feet three and one-half inches Westerly from the Westerly line of said Louisiana Street and one hundred and thirty-one feet eight inches Southerly from the Southerly line of said Twentieth Street; thence South Westerly Two hundred and seventy-three feet seven and one-quarter inches to a point in the Northerly *178 line of Twenty-first Street (formerly Sbasta Street) which is distant Fifty-two feet Easterly from the point of intersection of the Easterly line of Georgia Street with said Northerly line of said Twenty-first Street; thence Southerly and at a right angle to said Northerly line of said Twenty-first Street Thirty-three feet to the center line of said Twenty-first Street; thence Westerly along said center line of said Twenty-first Street to the center line of Georgia Street; thence Southerly along the center line of said Georgia Street to a point which is One hundred and fifty-four feet Southerly from the Southerly line of Twenty-second Street (formerly Sierra Street) ; thence Easterly and parallel with said Southerly line of said Twenty-second Street to the center line of Water Front Street (formerly Massachusetts Street) ; thence Northerly along said center line of said Water Front Street to the center line of Nineteenth Street; and thence Westerly along said center line of said Nineteenth Street to the point of commencement:
together with all the real property owned by said party of the first part situate on the Potrero Nuevo in said City and County, together with all Easements and Eights of Way appendant or appurtenant to said real property, together writh all the Buildings, Machinery, Engines, Boilers, Appliances, Plant and Ap-Íurtenances thereunto belonging, and all the Tools and mplements situate thereon on the Twentieth day of March in the year one thousand nine hundred.
This deed is the first in the chain of conveyances wherein the parcels subject of this action are specifically embraced within the perimeter of the description of lands purported to be conveyed. The metes and bounds description in material respects runs along the center lines of bounding streets.
On May 4, 1911, the Bisdon Iron and Locomotive Works executed a deed (Exhibit No. 12) to Thomas Murray, which was recorded in the office of the [Recorder of the City and County of San Francisco, State of California, on May 4, 1911, in Liber 510 of Deeds at page 203. The first part of the land description therein is identical with the first paragraph of the description last set forth above, and in addition includes the following:
together with the northerly Point of North’s Shipyard in Potrero Nuevo in said City and County of *179 San Francisco and all the Lands, Grants, Franchises, Privileges, Eights of Way and Eights to Water Front and also the Ship’s Ways, Marine Eailways and all appendant rights, easements and appurtenances granted and conveyed by Deed dated September 3rd, 1869, by John G. North and Emeline L. Morland North, his wife, to the said Eisdon Iron and Locomotive Works and all Lands, Eights, Franchises, Privileges and Easements granted by the State of California to said John G. North by the Act of the Legislature of the said State of California, approved May 2nd, 1862, Chap. 348 (Stats. 1862, p. 474), entitled “An Act to Authorize the Construction of A Marine Eailway on the Western shore of the Bay of San Francisco,” and assigned by said Deed to the Grantor herein, which Deed is duly recorded, July 18, 1870, in Liber 569 of Deeds, Folio 245 with all the Streets and adjacent Streets, and also all the Lands, Franchises, Eights, Easements and Privileges granted by the State of California by Act of the Legislature of the said State of California Approved April 2nd, 1866, Chap. 616 (Stats. 1866, p. 841) entitled “An Act to authorize the sale to william alvord his Associates and Assigns of certain overflowed lands in the City and County of San Francisco, State of California,” the Patent for which was duly issued by said State of California on February 27th, 1869, recorded on March 9,1869, in Liber 1 of Patents, Fol. 47, and all the Lands, Eights, Franchises and Privileges therein with the Streets adjacent as in said Act provided, and which said premises include Blocks and part of Blocks, 461, 462, 463, 478, 479, 480, 486, 487, 488, 489, 504, 505, 506 and 507 and Water Fronts and rights to Water Front and the Streets adjacent as by said Acts and grants are expressed and conveyed and all situate in Potrero Nuevo, in said City and County of San Francisco, and State of California, together with all Easements and Eights of Way Appendant or Appurtenant to said real property and all the Buildings and Machinery, Engines, Boilers, Appliances and Plant situated upon said Premises or any part thereof.
Certain exceptions are provided in the deed which are not pertinent here. The deed was properly signed and acknowledged.
On November 10,1911 Thomas Murray and Mary C. Murray, his wife, executed a deed (Exhibit No. 13) to the United States Steel Products Company, which was recorded in the *180 office of the Recorder of the City and County of San Francisco, State of California, on November 23, 1911, in Liber 573 of Deeds at page 280. The description set forth in this deed is substantially the same as that previously contained in the deed from the Risdon Iron and Locomotive Works to Thomas Murray.
On June 30, 1930, the United States Steel Products Company executed a deed (Exhibit No. 14) to Columbia Steel Company, which was recorded in the office of the Recorder of the City and County of San Francisco, State of California, on July 9, 1930, in Book 2063 of the Official Records on page 133. The land description is as follows:
BEGINNING at a point, which point is located in the center line of Napa (Twentieth) Street, produced N. 85° 30' East, and is distant along this line eight hundred and forty (840) feet north, 85° 30' East from the intersection of the center lines of Napa Street and Illinois Street; thence North 85° 30' East two hundred and eighty (280) feet; thence North 4° 30' West four hundred and sixty six (466) feet; thence North 85° 30' East five hundred and seventy (570) feet; thence South 4° 30' East fifteen hundred and eighty-five (1585) feet; thence South 85° 30' West eleven hundred and thirty (1130) feet; thence North 4° 30' West six hundred and fifty-three (653) feet; thence North 85° 30' East ninety-two (92) feet; thence North 4° 30' West thirty-three (33) feet; thence North 6° 49' East two hundred and seventy-three (273) feet seven and one-quarter (7*4) inches; thence North 85° 30' East one hundred and thirty-five (135) feet three and one-half (3y2) inches; thence North 4° 30' West one hundred and sixty-four (164) feet eight (8) inches to the point of beginning.
The deed contains other recitals which are not pertinent here. It was properly executed and acknowledged.
On November 14,1940, Columbia Steel Company, executed a deed (Exhibit No. 15) to the United States of America, which was recorded in the office of the Recorder of the City and County of San Francisco, State of California, on December 3,1940, in Book 3680 of Official Records at page 495.
The formal description of the property in the deed reads as follows:
_ beginning at a point on the center line of Twentieth Street (formerly Napa Street), distant thereon *181 North 85° 30' East 840 feet from its intersection with the center line of Illinois Street; running thence along said center line of Twentieth Street extended North 85° 30' East 280 feet to the center line of Maryland Street as shown on Map of Potrero Nuevo, filed March 21st, 1864, in Book “C” and “D” of Maps, at pages 78 and 79, in the Office of the Recorder of the City and County of San Francisco, State of California, prior to the closing of any portions thereof; thence at a right angle North 4° 30' West along the last mentioned line 466 feet to the former center line of Nineteenth Street (formerly Butte Street), as shown on said Map, prior to the closing of any portion thereof; thence at a right angle North 85° 30' East along the last mentioned line in its production, a distance of 570 feet; thence at a right angle South 4° 30' East 1585 feet to a line drawn parallel with and perpendicularly distance 154 feet southerly from the southerly line of Twenty-second Street (formerly Sierra Street) extended, as shown on said Map, prior to the closing of any portion thereof; thence South 85° 30' West along the line so drawn 1070 feet to a point distant thereon North 85° 30' East 60 feet from the former center line of Georgia Street; thence northwesterly directly to a point in the former easterly boundary line of Georgia Street, as shown on said Map, prior to the closing of any portion thereof, distant thereon South 4° 80' East 101.2 feet from the southerly boundary line of Twenty-second Street extended; thence northwesterly directly to the intersection of the westerly boundary line of said Georgia Street with a southerly boundary line of Twenty-second Street; thence North 4° 30' West along the westerly boundary line of said Georgia Street extended 66 feet to the former northerly boundary line of Twenty-second Street; thence North 85° 30' East along the northerly boundary line of Twenty-second Street extended 40 feet to the center line of said Georgia Street; thence North 4° 30' West along the last mentioned line 433 feet to a point perpendicularly distant 433 feet southerly from the southerly line of Twentieth Street; thence at a right angle North 85° 30' East and parallel with said line of Twentieth Street 92 feet; thence at a right angle North 4° 30' West 33 feet; thence North 6° 49' East 273 feet and 7y2 inches to a point which is perpendicularly distant 131 feet and 8 inches southerly from the southerly line of Twentieth Street and also perpendicularly distant 135 feet and 3% inches westerly from the center line of Louisiana Street, as shown on said Map, prior to the closing of any portion *182 thereof; thence North 85° 30' East on a line drawn at a right angle to said center line of said Louisiana Street 135 feet and 3y2 inches; thence, at right angles North 4° 30' West along the last mentioned line 164 feet and 8 inches to the point of beginning.
Reference herein to any and all so-called streets is solely for the purpose of description in order to tie the same to the description of all adjacent lands and premises adjoining the lands herein described and shall not be taken as an admission of the existence of any streets whatsoever within the boundaries of the lands herein described, all as stated in the Grantor’s warranties herein set forth, hereby granting, bargaining, selling and conveying the fee simple absolute title to the above described lands, and all improvements thereon, clear of all mineral rights, streets, highways, easements, restrictions, leases, judgments, taxes and assessments existing or inchoate, liens, or encumbrances of any sort at the date of the transfer of the title to the United States.
The deed contains certain recitals which are not pertinent to the issues in this case. The perimeter of the so-called Risdon Yard, as described in the last deed, differs slightly, but only in immaterial respects from those described in the deeds previously mentioned in this Finding. This perimeter is shown on a map (Exhibit No. 19) reproduced in this report and the disputed lands are the shaded areas within the perimeter.
On the execution of the deed dated November 10, 1911, from Thomas Murray and wife to the United States Steel Products Company, the grantee went into possession of the lands described and carried on operations and remained in the exclusive possession thereof until June 30,1930, when it conveyed the land to Columbia Steel Company by the deed above referred to. Thereupon Columbia Steel Company went into possession of the lands described and carried on operations and remained in the exclusive possession thereof until it conveyed to the United States of America by the deed dated November 14, 1940, whereupon the United States of America went into possession of the lands and has remained in the exclusive possession thereof ever since. Bethlehem Steel Company owned and operated a shipyard immediately adjacent to the land described. Under contract dated Sep *183 tember 9,1940 (Exhibit No. 15A) the United States had the Bethlehem Steel Company erect and operate facilities on the Bisdon Yard in conjunction with its own shipyard in a ship building program. Possession was taken and continued as above stated without the permission of the State of California.
The agreement between the Bethlehem company and the United States was a facilities contract entered pursuant to Section 8 (b) of the Act of June 28, 1940, Public Law 671, 76th Cong., 3d sess. It recited that the Secretary of the Navy had found that it was impossible, except in the manner contemplated by the statute, to obtain necessary ship building facilities to expedite the construction of naval vessels. The contract stated that funds were available for the purpose, and further provided in part as follows:
Article 1. The contractor shall, subject to the terms and conditions of this contract, promptly erect, furnish and/or install the buildings, utilities, facilities, and appurtenances thereto, identified in Exhibit I attached to and forming a part of this contract and hereinafter sometimes collectively referred to as the Facilities.
#
Art. 8. The contractor is hereby granted the exclusive right, until the completion of the construction of such vessels or until a determination is made by the Secretary of the Navy that the Facilities are no longer necessary for the national defense, whichever shall be the last, to operate the Facilities as a part of the plant of the contractor without compensation for its services except as provided for herein or by other agreement. During said period in which the contractor shall operate the Facilities, the contractor will at its own expense keep them insured against damage and provide all reasonable protection and maintain them in good working order and condition, ordinary wear and tear excepted: Provided, however, That the foregoing provision shall not prevent the contractor from apportioning such expense as a part of the cost of performing other work at its said plant. The contractor shall, during the period of the construction of such vessels and during the national emergency declared by the President of the United States on September^, 1939, to exist, give priority in the use of these Facilities for Department work on national defense.

*184

*185 All of the deeds of conveyance referred to in this Finding 12 include within the perimeter descriptions the lands claimed by the plaintiff herein. The plaintiff does not admit that possession taken by the several grantees, and specifically the defendant, was lawful.
An official of the State Lands Commission of the State of California in October 1950 called at the real estate section of the 12th Naval District in the Federal Building at San Francisco to inspect the facilities contract between the defendant and Bethlehem Steel Company for the purpose of determining the exact date and character of Bethlehem’s occupation. The request for such inspection at that time was refused.
13. On June 26, 1868, the Board of Tide Land Commissioners adopted a resolution relating to streets, the Board’s minutes at page 8 thereof reading as follows:
The following was offered by Commissioner Bullock, seconded by Commissioner Coon:
Resolved, That the spaces marked and designated upon the map as streets be reserved as public streets with the names placed thereon; and that the spaces included within the said streets respectively as delineated upon the map be established as the legal plan of the blocks, as far as the survey has been made; the modifications contained in the resolutions this day adopted, having been first duly delineated on said map.
The resolution was adopted by the following vote: Commissioner Coon voted aye, Commissioner Bullock aye, Commissioner Washington, no — ayes, 2, nos, 1.
On March 19,1869, the Board of Tide Land Commissioners established a Water Line Front as provided in the Act of March 30, 1868. The Board’s minutes (Exhibit No. 16), insofar as pertinent to this case, read as follows:
Resolved, that the Water Line Front of the City and County of San Francisco be declared and is hereby established as follows, viz:
* * * thence Southerly and parallel to Louisiana Street 392 feet to the Southerly line of Solano Street, if extended; thence Southeasterly in a straight line to a point in the Westerly line of Massachusetts Street, if extended, and 84 feet Northerly from the Northerly line of Butte Street, if extended; thence Southerly along the Westerly line of Massachusetts Street, if extended, to the *186 Northerly line of Shasta Street, if extended; thence Southeasterly in a straight line to a point in the Southerly line of Sierra Street, if extended, and 150 feet Easterly from the Westerly line of Massachusetts Street, if extended; thence Southerly and parallel to Massachusetts Street to a point 166 feet Southerly from the Southerly line of Nevada Street, if extended;
On March 19, 1869, said Board of Tide Land Commissioners established Water Front Street. The Board’s minutes (Exhibit No. 17) state as follows:
Resolved\ That a street be declared and established along and inside the entire water line front, excepting where said water line front is intercepted by China Basin, part of Louisiana Street, Central Basin, Tide Lands granted to Alvord and associates, Islais Creek Channel, India Basin, Dry Dock Basin, and South Basin. Said street shall be 150 feet in width and shall be known as Water Front Street.
On March 19, 1869, the Board of Tide Land Commissioners, by resolution on page 43 of the minutes, extended Louisiana, Maryland and Delaware Streets northerly to Central Basin (which is north of the lands in dispute) and Napa and Butte Streets easterly to Water Line Front.
The Board of Tide Land Commissioners also adopted the following resolution on page 44 of their minutes:
Resolved, That the system of streets and blocks adopted on the Potrero Nuevo survey, made by William J. Lewis, in eighteen hundred fifty-six, a map of which is on file in the Becorder’s office of the City and County of San Francisco be and hereby is extended southerly to First Avenue and India Streets and easterly to Water Front.
On March 4, 1870, the Board of Supervisors of the City and County of San Francisco adopted Order No. 911, reading as follows:
Section 1. All the streets and avenues delineated upon a certain map entitled “A map of the salt marsh and tide lands lying under water south of Second Street and situate in the City and County of San Francisco” and dated March 19, 1869, which has been prepared and adopted by the Board of Tide Land Commissioners and the State Board under and by virtue of an Act entitled “An Act to survey and dispose of certain salt marsh and *187 tide lands belonging to the State of California” approved March 30,1868, and is now on file in said Commissioners’ office in San Francisco aforesaid, are hereby declared to be and adopted as open public streets and avenues and highways of and in this City and County.
Section 2. The City and County Surveyor of San Francisco aforesaid is hereby authorized and requested to draw and compile, delineate and place upon the map of the City and County now being prepared by him the streets and avenues aforesaid exhibiting thereupon the width of such streets and avenues, the number and dimensions of the resulting blocks, the water front line, together with the reservations made by the Commissioners aforesaid, for basins, canals, market places, produce, exchange and other public uses.
The official map of the City and County of San Francisco, prepared and filed in 1870 by Win. P. Humphreys, City and County Surveyor (Exhibit No. 17A), shows the blocks and streets substantially as set forth in the Lewis map, supra.
14. For general illustrative purposes, an airplane photograph taken on June 20, 1948, showing the area of the parcels in litigation in this action and adjacent areas, is in evidence as Exhibit No. 20. Exhibit No. 18 is a map of the plants located on the Risdon Yard as of about 1940, depicting the parcels in litigation and approximate dates when structures were placed thereon. Exhibits Nos. 23 and 24 are airplane photographs of the Risdon Yard in 1940.
15. Prior to 1914 no part of the disputed lands was assessed for taxes but the adjacent blocks (numbered according to the Lewis map, supra) were assessed and the taxes paid by defendant’s predecessors in title. In 1914 the Assessor of the City and County of San Francisco adopted an Assessor’s Map showing the Risdon Yard (identified as Columbia Steel Company) and indicated that from 1914 until the sale of the Risdon Yard to the defendant in 1940, taxes were assessed against assessor’s blocks numbered 4052, 4053, 4119, 4113/4118, 4114/4117, 4115/4116, 4176, 4177, 4178 and 4179, as shown on the map. (Exhibit No. 21.) The above-numbered tax assessor’s lots are the same as the block numbers appearing on the Lewis map and on the Board of Tide Land Commissioners’ map as blocks numbered 507, 486, 461/462, 480/479, 487/488, 506/505, 463, 478, 489 and 504, respec *188 tively. Tbe tases assessed against the property were paid by the defendant’s predecessors in interest. During said period none of the streets shown on Exhibit No. 21 was assessed for taxes. Since 1940 none of the lands in the Risdon Yard was assessed for taxes.
16. It was formally agreed by the parties that some of the disputed lands were above and some below the line of ordinary high tide in 1869. It was further agreed that if the exact facts in this regard, or in regard to which lands are now above and which are now below the present line of ordinary high tide, become material to this controversy, further evidence would be later offered with respect thereto.
17. Parcel 1A of the disputed lands (See map of Risdon Yard, supra) lies outside the Water Line Front as shown and established by the “Map of Salt Marsh and Tide Lands” and as declared and established by the resolution of the Board of Tide Land Commissioners dated March 19, 1869, and is submerged land.
18. Parcel IB is a portion of Water Front Street (formerly Massachusetts Street) and part of it is above, and part below present ordinary high tide.
19. Parcel 2 is a portion of Butte Street (now 19th Street) and is submerged land lying bayward of the line of mean high tide.
20. Parcel 3 is a portion of Napa Street (now 20th Street) and part of it is above, and part below present ordinary high tide.
21. Parcel 4 is a portion of Shasta Street (now 21st Street) and Delaware Street and part of it is above, and part below present ordinary high tide.
22. Parcel 5 is a portion of Sierra Street (now 22nd Street) and part of it is above, and part below present ordinary high tide.
23. Parcel 6 is a portion of Louisiana Street and at the time of the filing of this action was filled land.
24. Parcel 7A consists of the easterly one-half of Maryland Street lying adjacent to Block 486. All except the extreme northerly tip of Parcel 7A was filled land at the time of the institution of this action.
*189 25. Parcel 7B is contained within Maryland Street adjacent to portions of Blocks 487 and 480. At the time of the filing of this action all of Parcel 7B was filled land.
26. Parcel 8A is contained within Delaware Street lying between Blocks 507 and 486. Approximately the northerly two-thirds of Parcel 8A is now submerged land lying bay-ward of the line of present ordinary high tide. The remainder of the area, being roughly the southerly one-third of Parcel 8A, was at the time of the filing of this action filled land.
27. Parcel 8B is a portion of Delaware Street lying between Blocks 487 and 506. At the time of the filing of this action all of Parcel 8B was filled land.
28. Parcel 8C is contained within Delaware Street lying between Blocks 489 and 504. At the time of the filing of this action all of Parcel 8C was filled land.
29. The acreage within that portion of Parcel 1A adjacent to Parcels 2 and 3 and to Blocks 506 and 507 and that portion of Parcel IB and of 1A adjacent to Parcel 4 northerly of the center line extended of Shasta Street is 1.07 acres. The acreage of Parcel 2 is 0.39 acre. The acreage of Parcel 3 lying between Blocks 486 and 507 on the north, and 487 and 506 on the south, and between Parcels 7A and 8A on the north, and the easterly one-half of 7B and 8B on the south, is 0.79 acre. The acreage of Parcel 4 in the northerly one-half of Shasta Street adjacent to Blocks 487 and 506, and to Parcel 8B is 0.28 acre. The acreage of Parcel 7A adjacent to Block 486 is 0.37 acre. The acreage of that portion of Parcel 7B lying within the easterly one-half of Maryland Street adjacent to Block 487 is 0.31 acre. The acreage of Parcel 8A lying between Blocks 486 and 507 is 0.73 acre. The acreage of Parcel 8B lying between Blocks 487 and 506 is 0.73 acre. The aggregate acreage of the foregoing parcels and portions thereof lying between Blocks 486, 487, 506 and 507 and adjacent thereto (to the extent of one-half of the surrounding streets) is 4.67 acres.
The acreage of Parcel 3 lying between the east line ©f Maryland Street and the Water Line Front is 0.73 acre. This acreage plus the acreage of Parcels 8A and 8B totals 2.19 acres.
*190 The area referred to by Statutes of California, 1865-1866, ch. 616, p. 841 (Finding 4 hereof) comprises Blocks 486, 506, 507 and that portion of Block 487, which is tide and submerged land. The total acreage of these blocks without including any streets is 7.24 acres according to Tideland Survey No. 57. The acreage of these blocks, plus the acreage of the intervening and surrounding half-widths of streets totals 11.91 acres. The acreage of these blocks plus the acreage of only the intervening streets totals 9.43 acres.
The Act of March 28,1868 (Finding 4 hereof), authorized the survey and sale of “all the northerly three-fourths of Block numbered five hundred five,” which, according to Tideland Survey No. 63 contains 1.37 acres (Exhibit No. 3). The Act provided that this property should be sold for not less than $300 per acre.
In accordance with the petition referred to in Finding 4, the patentee made a total payment of $2,583, which represented a payment of $2,172 for 7.24 acres in Blocks 486, 487, 506 and 507 at $300 per acre, and a payment of $411 for 1.37 acres in Block 505 at $300 per acre, in accordance with the Act of March 28,1868.
30. The Bisdon Yard, with the exception of the waterfront, was enclosed by a fence and had been so enclosed since 1911, and probably prior thereto.
31. None of the disputed lands was ever improved as a street.
32. Portions of 19th, 20th, 22d, Georgia, Louisiana, Maryland, Delaware and Water Front Streets were closed and abandoned by Besolution 1376 of the Board of Supervisors of the City and County of San Francisco adopted October 14, 1940 (Exhibit No. 22). The pertinent portions of the resolution are as follows:
CLOSING AND ABANDONING PORTIONS OE 19TH, 20TH, 22ND, Georgia, Louisiana, Maryland, Delaware and water ERONT STREETS (SERIES OE 1939)
Besolution No. 1376, as follows:
Whereas, On the 16th day of September, 1940, the Supervisors of the City and County of San Francisco duly and regularly passed Besolution No. 1298 (Series of 1939), which resolution was presented to his Honor, *191 the Mayor, for his approval and was duly and regularly approved by the Mayor of the City and County of San Francisco on the 17th day of September, 1940; said resolution being in words and figures as follows:
INTENTION TO CLOSE AND ABANDON PORTIONS OF 19TH, 20TH, 22ND, GEORGIA, LOUISIANA, MARYLAND, DELAWARE AND WATER FRONT STREETS (SERIES OF 1939)
Eesolution No. 1298, as follows:
Eesolved, That the public interest requires that the certain following described portions of 19th Street, 20th Street, 22nd Street, Georgia Street, Louisiana Street, Maryland Street, Delaware Street, and Water Front Street be closed and abandoned; and be it
Further Eesolved, That it is the intention of the Board of Supervisors to close and abandon all those portions of 19th, 20th, 22nd, Georgia, Louisiana, Maryland, Delaware, and Water Front Streets more particularly described as follows, to-wit:
All of 19th Street lying between the westerly line of Maryland Street and the westerly line of the State Harbor Board jurisdiction;
All of 20th Street lying between the westerly line of Louisiana Street and the westerly line of the State Harbor Board jurisdiction ;
All of 22nd Street lying between the westerly line of Georgia Street and the westerly line of the State Harbor Board jurisdiction; '
All of Georgia Street lying between 20th Street and 22nd Street;
All of Louisiana Street lying between 20th Street and a point 154 feet southerly from 22nd Street, said point being on the northerly line of the property of the Pacific Gas and Electric Company;
All of Maryland Street lying between 19th Street and a point 154 feet southerly from 22nd Street, said point being on the northerly boundary of the property of the Pacific Gas and Electric Company;
All of Delaware Street lying between 19th Street and the southwesterly line of State Harbor jurisdiction on the north and a point on the south 154 feet southerly from 22nd Street, said point being the northerly boundary of the property of the Pacific Gas and Electric Company;
All of Water Front Street lying north of a point 154 feet southerly from 22nd Street and the southwesterly line of the State Harbor jurisdiction.
*192 Privilege of the Floor
Mr. Walter Shelton, attorney representing the Columbia Steel Company, explained the need of the foregoing Street Closing, stating that the Navy Department is taking over the property in order to lease it to the Bethlehem Shipbuilding Corporation, but insists on the closing of the streets involved before so taking over the property.
ADOPTED
Thereupon, the foregoing Resolution was adopted by the following vote •
Ayes: Supervisors Brown, McGowan, McSheehy, Mead, Meyer, Ratto, Roncovieri, Schmidt, Shannon, Uhl — 10.
Absent: Supervisor Colman — 1.
The foregoing resolution does not describe Parcel 1A or that portion of Parcel 4 outside of Delaware Street, but otherwise covers the disputed lands.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law plaintiff is not entitled to recover and its petition is dismissed.